184 F.3d 492 (6th Cir. 1999)
 NANCY ROBIN GREENWELL, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF RICHARD W. GREENWELL, PLAINTIFF-APPELLANT (98-5722),
STATE AUTO INSURANCE COMPANY, INTERVENING PLAINTIFF-APPELLANT (98-5721),
v.
DAVID L. BOATWRIGHT; PATRICIA CALLIS; KLLM, INC., DEFENDANTS-APPELLEES.
 Nos. 98-5721, 98-5722
 U.S. Court of Appeals, Sixth Circuit
 Argued: June 10, 1999
Decided and Filed: July 28, 1999
Rehearing and Rehearing En Banc Denied Oct. 8, 1999.*
 
 [Copyrighted Material Omitted]
 Argued: Sheryl G. Snyder, Brown, Todd & Heyburn, Louisville, Kentucky, for Appellants. J. Denis Ogburn, Crafton, Martin, Ogburn & Zipperle, Louisville, Kentucky, for Appellees. ON Brief: William T. Donnell, Charles S. Cassis, Brown, Todd & Heyburn, Louisville, Kentucky, John F. Carroll, Jr., J. Chester Porter & Associates, Shepherdsville, Kentucky, Kelly Mark Easton, Coleman, Easton, Lochmiller & Hall, Elizabethtown, Kentucky, for Appellants. J. Denis Ogburn, Crafton, Martin, Ogburn & Zipperle, Louisville, Kentucky, Armer H. Mahan, Jr., Lynch, Cox, Gilman & Mahan, Louisville, Kentucky, for Appellees.
 Appeal from the United States District Court for the Western District of Kentucky at Louisville. No. 94-00614--Charles R. Simpson, III, Chief District Judge.
 Before: Merritt, Kennedy, and Siler, Circuit Judges.
 Kennedy, J., delivered the opinion of the court, in which Siler, J., joined. Merritt, J. (pp. 14-29), delivered a separate Dissenting opinion.
 OPINION
 Kennedy, Circuit Judge.
 
 
 1
 Plaintiffs Nancy Robin Greenwell, individually and as Executrix of the Estate of Richard W. Greenwell appeal the district court's denial of their Motion to Strike the Testimony of Kenneth Razak, defendant KLLM, Inc.'s accident reconstructionist, their Motion for a Directed Verdict as to Liability and their Motion for Judgment as a Matter of Law or Alternatively a New Trial. Plaintiffs request that we remand this case and order the district court to enter a judgment against the defendants on the issue of liability. In the alternative, plaintiffs request that we vacate the district court's judgment and remand the case for a new trial, with instructions that the district court Judge hold a Daubert hearing as to the admissibility of the expert testimony. Although the Plaintiffs raise many issues on appeal, the essence of this legal dispute turns on the admissibility of the testimony of Kenneth Razak, KLLM, Inc.'s accident reconstructionist. Because we believe the district court did not err in admitting the expert testimony, we AFFIRM the district court.
 
 I. Facts and Procedural History
 
 2
 Plaintiffs and defendant Boatwright were involved in an auto accident on July 27, 1994 in Jefferson County, Kentucky. Plaintiffs were traveling southbound on I-265, as was Boatwright, when a collision occurred causing the plaintiffs' pickup truck to move from the left, across the expressway, into the right hand guardrail. Defendant Boatwright's Peterbilt truck also came to rest on the right hand side of the road. As a result of this accident Richard Greenwell was killed, Nancy Greenwell was slightly injured, and the plaintiffs' truck incurred major property damage. Plaintiffs filed a wrongful death and personal injury action against Boatwright, KLLM, Inc., who had an agency agreement with Boatwright, and Callis, the owner of the Peterbilt truck.
 
 
 3
 At trial defendant KLLM, Inc., introduced the testimony of an accident reconstructionist expert, Kenneth Razak. Prior to the expert's testimony, plaintiffs filed a Motion in Limine to exclude a videotape re-enactment of the accident and the expert's testimony. Because defendant KLLM, Inc., chose not to offer the videotape into evidence, the district court Judge did not rule on this motion. The plaintiffs renewed their objection to the expert testimony at trial. The district court Judge, however, allowed the expert to testify. During the course of this testimony, plaintiffs' counsel objected to a statement by the expert that focused on the reliability of eyewitness testimony. Although the district court Judge permitted defendant Boatwright's counsel to pursue this line of questioning, he did not. At the end of theevidence, plaintiffs made a Motion to Strike the Testimony of the expert and a Motion for a Directed Verdict as to Liability. Both motions were denied by the district court Judge and the case was sent to the jury. The jury returned a verdict finding no liability for the defendants. Plaintiffs filed a Motion for Judgment as a Matter of Law or Alternatively a New Trial, which was denied by the district court Judge. This appeal followed.
 
 
 4
 Plaintiffs raise four issues on appeal: (1) whether the district court erred to the substantial prejudice of the plaintiff when it permitted the defendant's expert to testify as to the validity of eyewitness testimony; (2) whether the district court erred in permitting the expert's testimony as to his findings regarding the accident; (3) whether the district court erred in denying plaintiffs' Motions for a Directed Verdict and Judgment Notwithstanding the Verdict; (4) whether the district court abused its discretion in denying the plaintiffs' Motion for a New Trial.
 
 II. Discussion
 
 5
 The first issue that the plaintiffs raise on appeal concerns statements that the defendant's expert made during his testimony. Plaintiffs argue that the district court erred in allowing the expert to testify as to the validity of statements made by other witnesses. This Court reviews a trial court Judge's ruling as to the admissibility of evidence for abuse of discretion. See Snyder v. AG Trucking, Inc., 57 F.3d 484, 492 (6th Cir. 1995). "A finding of abuse of discretion will be made only where the reviewing court is firmly convinced that a mistake has been made." United States v. Williams, 952 F.2d 1504, 1518 (6th Cir.1991). Although we agree with the plaintiffs that the expert's statements were inadmissible opinion testimony, we do not find that the admission of these statements resulted in substantial prejudice to the plaintiffs.
 
 
 6
 At trial, defendant KLLM, Inc.'s expert introduced a theory as to liability that contradicted aspects of the eyewitnesses' testimony. During this testimony, defendant Boatwright's counsel asked the expert to give his opinion as to the accuracy of a statement that conflicted with his analysis. The exchange was as follows:
 
 
 7
 "Q: Let me ask you to assume that one person who was a witness to this accident has testified that the semi tractor being operated by Mr. Boatwright spun in a counter clockwise direction. Based upon the analysis that you made of the damage to the vehicles and their location, do you have an opinion as to whether or not that is an accurate or inaccurate statement?"
 
 
 8
 "A: In evaluating eye-witness testimony, I will not charge an eyewitness with fabricating testimony. I'll merely say that's the best judgment of what they saw and their interpretation of what they saw within the knowledge that they have and to the extent it's a sincere statement on their part. But I also have to observe that an event which takes place in a few seconds, only a certain type of recollection can exist of any person trying to witness, trying to recall an event that takes place in a short time."
 
 
 9
 "Plaintiff's counsel: Your Honor, this witness is not being responsive to this question at all. He's definitely not qualified to recollect events of people unless he's some kind of mental therapist or psychologist or psychiatrist. It's obviously not being responsive to the question."
 
 
 10
 "The Court: I think he's getting to it."
 
 
 11
 "Witness: May I hear the question again, please."
 
 
 12
 "Q: Sure. Let's go with based upon the analysis that you made and all of the information you gathered, do you have an opinion on the basis of scientific probability as to whetheror not Mr. Boatwright's semi tractor when it spun, spun in a counter clockwise direction to cause this accident as opposed to some other direction after the accident."
 
 
 13
 "A: I have an opinion on that point."
 
 
 14
 "Q: And what is that opinion?"
 
 
 15
 "A: That the spin out of the truck was induced after the contact between the truck and pickup. That it was in a clockwise direction."
 
 
 16
 "Q: Why do you say it was a clockwise direction?"
 
 
 17
 "A: Two reasons: Number one, the physical facts, particularly the way the tractor came up to and collided with the guardrail at Exit 25. The way it collided with the sign at Exit 25 damage to the truck, and the gaging in the grass and throwing of dirt onto the pavement of the Gene Snyder Freeway. All of those could have occurred only if the truck were spinning in a clockwise manner viewed from above. Those are the physical facts."
 
 
 18
 (J.A. 648-49).
 
 
 19
 Plaintiffs' counsel objected to the expert's response commenting on the credibility of eyewitness testimony as non-responsive, but did not move to strike the testimony. The district court Judge permitted the response.
 
 
 20
 Plaintiffs argue that the expert's testimony as to the credibility of eyewitness testimony was beyond the scope of his expertise. Defendants contend that this testimony was not intended to discredit the eyewitnesses' testimony, but rather was intended only to explain the expert's reasons for basing his theory on physical evidence, rather than the testimony of the eyewitnesses. Regardless of the intent or motivation of the expert in commenting on the eyewitness testimony, we agree with the plaintiffs that the testimony regarding the credibility of eyewitness testimony was improper; however, we also believe that the admission of this testimony amounts to harmless error.
 
 
 21
 In assessing whether this opinion testimony resulted in substantial prejudice to the plaintiffs, we must consider the statement in the context of the expert's entire testimony. After plaintiffs' objection to the testimony, the defendants did not pursue the line of questioning further. In the ninety-five recorded pages of the expert's testimony, this statement is the only one addressing the credibility of the other witnesses. In addition, plaintiffs were permitted to challenge all of the expert's testimony on cross-examination. Although the district court Judge did not sustain the plaintiffs' objection as to these statements, the Judge did provide proper instructions to the jury in assessing the expert's testimony. At the Conclusion of evidence, the district court Judge advised the jury that it was to weigh the credibility of each witness and if it determined that the expert's opinion was entitled to no weight, the jury could disregard the expert's testimony entirely. Given these facts, it is beyond the purview of this Court to find that the admission of this evidence caused substantial prejudice to the plaintiffs.
 
 
 22
 The second issue the plaintiffs raise on this appeal is that the district court erred in permitting the expert to testify without first conducting a Daubert hearing. In Daubert, the Supreme Court held that trial Judges were required to make an initial determination "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93 (1993). This two step inquiry requires the trial Judge to assess the relevance and the reliability of the expert's testimony. The relevance requirement ensures that there is a "fit" between the testimony and the issue to be resolved by the trial. See United States v. Bonds, 12 F.3d 540, 555 (6th Cir. 1993). The reliabilityrequirement is designed to focus on the methodology and principles underlying the testimony. See id. at 556.
 
 
 23
 Plaintiffs' arguments against the admissibility of the expert testimony focus on the second inquiry of the Daubert test -reliability. Because the expert's theory of the accident contradicts the testimony of the eyewitnesses plaintiffs contend that the testimony is inadmissible. Yet, the plaintiffs did not challenge the expert's credentials as to accident reconstruction. They also did not challenge the scientific formulas the expert used in making his determination of how the accident occurred. In addition, plaintiffs did not contend that the physical evidence the expert used was inadmissible. Rather, the plaintiffs challenge the Conclusions that the expert reached as to the cause of the accident. In particular, the plaintiffs fault the expert for not incorporating the testimony of the eyewitnesses into his theory of the accident.
 
 
 24
 The purpose of a Daubert hearing is to determine "the scientific validity and thus the evidentiary relevance and reliability -of the principles that underlie a proposed submission." 509 U.S. at 594-95. "[T]he Daubert Court has instructed the courts that they are not to be concerned with the reliability of the Conclusions generated by valid methods, principles and reasoning.... If the principles, methodology and reasoning are scientifically valid then it follows that the inferences, assertions and Conclusions derived therefrom are scientifically valid as well." Bonds, 12 F.3d at 556. In this case, the only issue to be resolved by a Daubert hearing is whether it was scientifically valid for the defendant's expert to base his theory solely on the physical evidence obtained from the accident. The expert proffered a legitimate explanation for his decision to disregard the eyewitnesses' testimony in reaching his Conclusion. He stated that the eyewitness testimony was contradictory and that he had no principled basis for accepting one eyewitness version of events over another; thus, he disregarded all of them.
 
 
 25
 A review of the record shows that the expert was correct in stating that the eyewitness testimony did contradict one another. In fact, two of the eyewitnesses claim to have been in the same location behind the Peterbilt truck when the accident occurred.[1] The difference between the expert's testimony and the eyewitnesses' testimony goes to the Conclusion that each witness reached as to the cause of the accident. Expert testimony is not inadmissible simply because it contradicts eyewitness testimony. Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony contradict the evidence. See United States v. Chaney, 577 F.2d 433, 435 (7th Cir. 1978).
 
 
 26
 Plaintiffs do not challenge the factual basis of the expert's testimony - the physical evidence - instead, they challenge theinferences made by the expert and the jury from that evidence. The testimony cannot be excluded on these grounds. Plaintiffs do not identify any factual assumptions by the expert that contradict the evidence. The expert's testimony was based on the facts conveyed by the physical evidence. Because the factual underpinnings of the expert's testimony were sound, his testimony is admissible.
 
 
 27
 For plaintiffs to succeed on this issue, they would have had to present facts that plainly contradict the physical evidence upon which the expert based his theory of the accident. The plaintiffs did not present facts contradicting the physical evidence; however, they now argue that the expert's testimony was inadmissible because it contradicted judicial admissions made by defendant Boatwright. Judicial admissions of fact preclude the introduction of contradictory evidence as to the admitted facts. See Ferguson v. Neighborhood Hous. Serv. of Cleveland, Inc., 780 F.2d 549, 550-51 (6th Cir. 1986). We find that Boatwright's statements do not constitute judicial admissions.
 
 
 28
 Statements become judicial admissions only when they are "deliberate, clear and unambiguous." MacDonald, et al. v. General Motors Corp., 110 F.3d 337, 340 (6th Cir. 1997). The alleged judicial admissions by Boatwright cannot be said to be "deliberate, clear and unambiguous" waivers of his right to contest the facts. Plaintiffs contend that Boatwright admitted he lost control of his vehicle. This alleged admission conflicts with the expert's reconstruction of the accident. Yet, Boatwright only stated that he lost braking control, he never conceded that he lost steering control. Boatwright's statements about his control over his vehicle are not unambiguous or clear; thus, they are not judicial admissions. Plaintiffs also point to Boatwright's statement that he was driving too fast to exit the expressway. The expert testified that Boatwright was incorrect about his ability to have exited the expressway at the speed he was traveling -- which the expert found to be greater than Boatwright had estimated. This is a statement of opinion, not fact. "Judicial admissions,..., typically concern only matters of fact." Id. at 341. Because Boatwright's statements are not judicial admissions the district court did not err in admitting evidence that contradicted these statements.
 
 
 29
 Although the trial court is not required to hold an actual hearing to comply with Daubert, the court is required to make an initial assessment of the relevance and reliability of the expert testimony. Because the district court did not hold a Daubert hearing we must review the record to determine whether the district court erred in its assessment of the relevance and reliability of the expert testimony. The plaintiffs have not proffered any basis for questioning the scientific validity of the expert's testimony, nor have they raised any issues as to its relevancy. We find that this testimony satisfies the two prong test of Daubert and was properly admitted by the district court.
 
 
 30
 The third issue the plaintiffs raise on appeal is that the district court erred by not granting their motion for judgment as a matter of law. We review a trial Judge's denial of a motion for judgment as a matter of law de novo. See Smelser v. Norfolk S. Ry. Co., 105 F.3d 299, 306 (6th Cir. 1997). In order for the plaintiffs to succeed on this issue, they must demonstrate that there was insufficient evidence to raise a question of fact for the jury. See Powers v. Bayliner Marine Corp., 83 F.3d 789, 796 (6th Cir. 1996). As we review the evidence, we must make all reasonable inferences in the light most favorable to the non-moving party. See id. "Only when it is clear that reasonable people could come to but one Conclusion from the evidence should a court grant a motion for directed verdict." Wayne v. Village of Sebring, 36 F.3d 517, 525 (6th Cir. 1994).
 
 
 31
 A ruling in favor of the plaintiffs on this issue would require us to find that the defendants offered no credible evidencecontesting the plaintiffs' theory of liability. As stated above, however, we have determined that the district court properly admitted the expert testimony because it was grounded in facts based on the physical evidence. Because this evidence could be accepted by the jury as credible it raises a question of fact for the jury. For this reason, we find that the district court did not err in denying plaintiffs' motion for a judgment as a matter of law.
 
 
 32
 The final issue that the plaintiffs raise on this appeal concerns the district court's denial of the plaintiffs' motion for a new trial. Our standard of review for this motion is abuse of discretion. See Powers, 83 F.3d at 796. "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." Id. A trial Judge should deny a motion for a new trial if the jury verdict is reasonable. See id. Again, plaintiffs' argument in support of this motion is based on the inadmissibility of the defendant's expert testimony. Because we find this testimony to be properly admitted we believe that the district court did not abuse its discretion in denying the plaintiffs' motion for a new trial.
 
 III. Conclusion
 
 33
 For the foregoing reasons, we AFFIRM the district court's judgment dismissing all claims against the defendants.
 
 
 
 NOTES:
 
 
 *
 Judge Boggs recused himself from participation in the ruling. Judge Merritt would grant rehearing for the reasons stated in his dissent.
 
 
 [1]
 The dissent holds that the expert's testimony lacks foundation because it fails to take into account the testimony of the eyewitnesses. The eyewitness testimony, however, is contradictory. One eyewitness contended that the Peterbilt truck was traveling with its trailer attached, while the other eyewitnesses stated that the Peterbilt truck was "bob-tailing." This same witness, who was traveling in the left lane, did not see either the pick-up truck in front of her or the two other cars in the right lane behind the Peterbilt truck. In addition, the two witnesses who claim to be traveling in the right lane report different locations of the Peterbilt truck. One witness stated that the Peterbilt truck was already traveling on the expressway as she merged immediately behind it from I-64. The other witness stated that the Peterbilt truck merged from I-64 onto the expressway immediately in front of her. Although the Dissent contends that the expert should have taken into account this testimony in formulating his opinion, the Dissent offers no methodology for reconciling these contradictions. The Dissent also argues that the expert should have considered alternative possibilities for how the accident occurred. The expert, however, did consider the Dissent's proffered explanation for the accident and found that it was not consistent with the damage to the vehicles and their ultimate location.
 
 
 
 34
 MERRITT, Circuit Judge, Dissenting. The jury accepted the testimony of defendant's accident reconstruction expert that Greenwell was at fault. It rejected the testimony of eyewitnesses contrary to the expert's reconstruction of the accident. On appeal, the plaintiffs claim correctly that the District Court erred in exercising its gatekeeper function by admitting certain testimony and exhibits by the expert. The District Court's error has led to a serious injustice.
 
 
 35
 ***
 
 
 36
 The principal factual issue in the trial of this case was which vehicle caused the accident by switching lanes. The accident between the semi-tractor and the pickup occurred while both vehicles were traveling south on the Gene Snyder Expressway near Louisville during a heavy, summer rain storm. Before the collision, the pickup was in the left lane and the semi-tractor in the right lane. The semi-tractor was traveling without a trailer, i.e., "bobtailing." Right before the collision, Boatwright in his semi-tractor attempted to leave the highway at an interchange by changing from the right lane to an exit lane on the right. As he decelerated to enter the exit lane, Boatwright, according to his own testimony, lost control of the semi-tractor when it began to "fishtail" -- i.e., the rear wheels of the semi-tractor skidded from side to side instead of following in the path of the front wheels. Boatwright said in deposition testimony and at the trial that he attempted to regain control of his truck by braking and then releasing his brakes and "countersteering" in order to make the rear and the front of the truck move in the same direction. Boatwright testified that he countersteered his truck to the left toward the pickup just before the collision occurred and then countersteered to the right after the impact. An eyewitness, Nicole Gray Besse, driving just behind the two, also testified that Boatwright was fishtailing immediately before the collision, veered to the left and struck Greenwell in the left lane. Two other eyewitnesses testified that the semi-tractor quickly veered from right to left just before the collision. None of these eyewitnesses were connected to the parties or had a motive to lie.
 
 
 37
 The defense paid Ken Razak to testify as an expert in accident reconstruction. Razak had an extensive academic background in mechanical engineering, had testified in previous cases well over 1000 times and was an impressive witness. Razak testified that the physical evidence in the case (i.e., the damage pattern to thetwo trucks and their final position after the collision on the right side of the road instead of the left) required the jury to conclude that the pickup caused the collision by veering right into the semi-tractor. The two trucks ended up on the right side of the highway with the pickup flipped over and resting on a guardrail. The left edge of the semi-tractor's large, heavy front bumper tore into the pickup's right fender just in front of its rear tire well and remained inserted in the fender until the front bumper bent 90 degrees forward to form an L with the top of the L pointing forward. From these two pieces of evidence -- the bumper-fender damage and the fact that the trucks came to rest on the right side of the road -- Razak testified that the accident had to have occurred because Greenwell veered to the right into Boatwright's lane of traffic. Razak was permitted to introduce and testify at length from six large well-constructed 3' x 4' drawings he had prepared showing the two trucks parallel to each other in the left and right lanes and then showing the pickup veering into the semi-tractor before they ended up on the right side of the expressway. The six large drawings from which Razak testified at length did not show the semi-tractor fishtailing with its rear wheels skidding from side to side, nor did it show the semi-tractor veering to the left, as Boatwright and the eyewitnesses testified.
 
 
 38
 During Razak's direct examination, plaintiffs' counsel objected to Razak's analysis because it assumed that the semi-tractor was moving parallel to the pickup right before the accident. Counsel sought to have the District Court exercise its gatekeeper function by excluding the testimony of Razak when he stated as a scientific fact, and showed on his drawings, that the accident was necessarily caused when Greenwell veered into Boatwright's lane. Plaintiffs' counsel stated that Boatwright and the three eyewitnesses had testified that the semi-tractor was fishtailing or moving from side to side right before the accident and that Razak did not take this conceded fact into account. The District Court overruled the objection and stated simply that Razak was qualified to offer his opinion whatever it may be and could be cross-examined later by the plaintiffs[1].
 
 
 39
 ***
 
 
 40
 The question in this case is whether the District Court properly performed its gatekeeper function with respect to Razak's expert testimony. He was allowed to testify at length, with the aid of his large drawings, the ultimate legal Conclusionthat Greenwell caused the accident by veering right into Boatwright. He was permitted so to conclude without taking into account the fishtailing movements of the semi-tractor or the fact that the accident could have happened just as the eyewitnesses described it.
 
 
 41
 Even before the Supreme Court's landmark decision in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), we required Judges, to give a "hard look" and carefully assess the scientific Conclusions and reasoning of experts because jurors are frequently overly impressed by conclusory opinions of scientific experts paid by a party. See Turpin v. Merrell Dow Pharm., Inc., 959 F.2d 1349, 1352 (6th Cir. 1992) (excluding the scientific testimony of plaintiff's expert in a Bendectine case). Today, trial Judges have an unequivocal duty to give careful scrutiny to the testimony of paid experts in order to avoid verdicts based on "junk science." As the Supreme Court again stated this past term, Federal Rule of Evidence 702 "imposes a special obligation upon a trial Judge to 'ensure that any and all scientific testimony... is not only relevant, but reliable,'" Kumho Tire comp. v. Carmichael, 119 S. Ct. 1167, 1174 (1999), quoting Daubert, 509 U.S. at 489. Under Daubert, trial Judges must act as "gatekeepers" to undertake a "preliminary assessment of whether the reasoning or methodology underlying [expert] testimony is scientifically valid." 509 U.S. at 592-93. Although these principles designed to detect and exclude junk science are perhaps most frequently applied to plaintiffs' paid experts, it is important that they should be applied equally to the experts of corporate defendants, as in this case. The rule is not one for plaintiff's experts only.
 
 
 42
 Trial Judges must be on guard against all forms of junk science that may creep into the courtroom. In Kumho Tire, for example, the Supreme Court was wary of a generally reliable methodology perverted by an expert's bogus analysis. The expert in Kumho Tire was retained to testify on the cause of a blown-out car tire. In his deposition, the expert reasoned that the blow-out was either caused by tire misuse or by a manufacturing or design defect. If the cause was misuse, the expert explained that the tire should reveal certain signs of stress. If a tire does not show at least two of these signs, the expert concluded that a design or manufacturing defect caused the blow-out. See 119 S. Ct. at 1172. The expert conducted a visual and tactile examination of the tires and found four signs of stress on the tire at issue. The expert testified that the signs were insignificant, however, and thus concluded that the blow-out was caused by a product defect and not by misuse. See id. at 1172-73. The Supreme Court held that the trial Judge was correct in excluding the expert's testimony because it was unreliable. See id. at 1179. The Court was careful to note that the practice of identifying tire misuse through visual and tactile inspection is generally reliable. See id. at 1178. The Court agreed with the trial court that the expert's analysis was faulty because the expert concluded that a product defect caused the blow-out despite the identification of four indications of some misuse on the tire. The Court criticized the expert's reasoning based on "fine distinctions" in identifying the signs of misuse and faulted the expert's related standard of misuse because he rigidly required at least two signs of tire distress. See id. The Court reemphasized a court's gatekeeper duties by closely analyzing the reasoning of the expert.
 
 
 43
 The case of Smelser v. Norfolk S. Ry. Comp., 105 F.3d 299 (6th Cir. 1997), holds that an expert opinion that relies on an untenable assumption rather than the evidence presented is unreliable. See id. at 305. Our Court held that the trial Judge should have excluded the expert's opinion on thecause of an accident victim's injuries when the expert assumed that the victim had no pre-existing injuries. See id. The expert did not study the victim's entire medical history and disregarded indications that he might have been injured similarly before. The expert also did not review the victim's deposition or interview him about his symptoms or his version of how his body shifted during the accident. See id.
 
 
 44
 In this case, we have both a Smelser and a Kumho Tire problem. Like Smelser, Razak's testimony, and his impressive drawings, were premised on an untenable assumption that Boatwright had full control over his semi-tractor and was traveling parallel with the pickup right before the accident. It disregarded the evidence. Both Boatwright and eyewitness Besse-Gray testified that the semi-tractor was fishtailing and out of control. Boatwright testified that he countersteered to the left just before the collision and to the right immediately afterward. By neglecting to take into account the course of the semi-tractor on the highway just before the accident, Razak foreclosed all possibility that the semi-tractor could have fishtailed into the pickup, hooked into the fender of the pickup and then pulled it to the right side of the road as Boatwright countersteered in that direction. Razak testified that the vehicles would necessarily have ended up in the median on the left if Boatwright had veered to the left and struck Greenwell.
 
 
 45
 Razak's disregard of evidence contrary to his theory leads to the deeper problem seen in Kumho Tire. Like the expert in Kumho Tire, Razak embraced a generally reliable science, i.e., accident reconstruction, but then corrupted it by restricting his theory of the accident by omitting the fishtailing evidence presented by plaintiffs' witnesses and Boatwright. His legal Conclusion that Greenwell was at fault was made to appear to the jurors as scientifically authoritative through his testimony and well-drawn exhibits. Razak limited his consideration of the collision essentially to two possibilities: (1) the pickup veered right into the semi-tractor or (2) the semi-tractor yawed left into the pickup without then changing direction to the right after the collision. Nowhere do these two possibilities contemplate a collision caused by the semi-tractor veering left and then changing direction in an effort to regain control immediately after impact. This is a plausible proposition of fact even in the absence of the witness testimony. In the face of the uniform testimony of the eyewitnesses, it was incumbent on the expert to take it into account. By failing to consider it, Razak arrives at his single-minded Conclusion that convinced the jury that the vehicles' final position on the right side of the highway meant that Greenwell caused the accident by veering into Boatwright. Razak testified that the pickup must have caused the collision because it generated enough force to tip and roll over to the right after it had veered right into the semi-tractor. Just because such force would be sufficient, however, does not make it necessary. It is clearly possible that the eyewitnesses were right. The same force could have been generated by the semi-tractor veering left into the pickup and then right to regain control after the collision and pulling the pickup with its bumper inserted into the fender of the pickup. The semi-tractor's force would have pointed the front of the pickup to the right. After being struck the pickup, attached to the semi-tractor bumper, would have traveled to the right as the semi counter-steered to the right. By ignoring this possibility -- the one testified to by the eyewitnesses -- the expert was allowed to mislead the jury. The expert's testimony and drawing showing his Conclusion was allowed to come in on the theory that it could all be explored and corrected by cross-examination.
 
 
 46
 Judges after Turpin, Daubert, Kumho Tire and Smelser may no longer indulge in this assumption that an expert's Conclusions and reasoning can all be corrected by cross-examination as in the past. Theymust analyze the expert's testimony carefully to see if the reasoning is "scientifically valid." Daubert, 509 U.S. 592-93. Here the expert, paid to testify for defendant, was improperly allowed to exclude as a possibility the way the witnesses said the accident happened and promote another theory as "scientific" truth. He was allowed through testimony and drawings to give the imprimatur of scientific certainty to the idea that Greenwell caused the accident because the trucks ended up on the right side of the road.
 
 
 47
 The District Court erred by admitting Razak's testimony for the reasons above. Plaintiffs' counsel attempted to alert the District Court of its gatekeeping duties by objecting to Razak's testimony based on the assumption that Boatwright had full control of his vehicle right before the collision. The District Court should have assessed whether Razak's single-minded theory was scientifically valid. Because the District Court failed to exercise properly its gatekeeping responsibilities, the judgment for the defendants should be reversed and remanded to the District Court for a new trial.
 
 
 48
 There is a growing tendency to apply the Daubert gatekeeper principles unequally against plaintiff but not corporate defendants. That has happened again in this case, I am sorry to say. In my view the rules excluding invalid scientific analysis should be applied to both sides. If that were done, Razak's unscientific testimony -- contrary to overwhelming evidence -- that Greenwell ran the back end of his truck across into Boatwright's front bumper would be excluded. The wreck clearly did not happen that way as the eyewitness testimony shows.
 
 
 49
 I am attaching an Addendum. It shows what the eyewitness testimony in this case was -- contrary to the conclusory statements about it made on pages 7 and 8 of the majority opinion.
 
 ADDENDUM
 
 50
 The majority claims that the testimony of the three eyewitnesses is in conflict. There is no conflict. All three testified that the semi-tractor fishtailed, lurched or spun to the left into the left lane and then went over the road to the right. So that the reader will have the testimony and can make up his or her mind, here is the relevant unimpeached testimony:
 
 I.
 
 51
 The witness, Nicole Gray Besse, a high school Spanish teacher from Jasper, Indiana, was right behind the semi-tractor when the wreck happened and testified in relevant part as follows:
 
 
 52
 "Q. How long in distance did you have an occasion to see the silver Ford pickup truck as you described it?"
 
 
 53
 "A. At what point was I aware that it existed?"
 
 
 54
 "Q. Yes, ma'am."
 
 
 55
 "A. Okay. Well, when I was coming around the curve and I was turning into -- I was merging into the right-hand lane behind the tractor truck. It was, oh, perhaps between the two of us, but in the left-hand lane. And it was going, say, 55 miles an hour. And the truck in front of me was going faster than me. The tractor was going faster than me. I was going about 40 by then and the tractor is going faster than me, because I could see it accelerating even faster and made that jerky decision when it started jerking back and forth. The silver truck was like going to pass. It would have passed it easily if it had not been swinging back and forth to hit."
 
 
 56
 "Q. What swinging back and forth?"
 
 
 57
 "A. The tractor was swinging back and forth with the fishtailing motion."
 
 
 58
 "Q. Did the Ford pickup truck, the silver truck, did it ever leave the left lane before the impact with the tractor?"
 
 
 59
 "A. No, absolutely not.""Q. Where did the impact between the tractor and the Ford silver truck occur?"
 
 
 60
 "A. Where in position of me?"
 
 
 61
 "Q. Where in the position of the lanes you described?"
 
 
 62
 "A. I would say it was approximately in the middle of the merging zone, but in the left-hand lane."
 
 
 63
 "Q. Don't mean to confuse you and if you don't understand the question, tell me. How did the tractor proceed from the exit area or attempting to exit to get to the left-hand lane?"
 
 
 64
 "A. It was the fishtailing motion. You could tell he was trying to get it under control, but he simply fishtailed. He couldn't get it under control. After that first abrupt jerk to the right and back to the left, it kept fishtailing one, two, three, four."
 
 
 65
 "Q. Could you ever determine the speed of the tractor?"
 
 
 66
 "A. It was going faster than me and I was going 40. Well, when it started fishtailing it might have been going a little slower simply because I had slowed down from my 40 miles an hour. I had slowed down as soon as I started seeing it fishtail. I thought, 'Oh, I'm going to watch out for this guy.'"
 
 
 67
 "Q. Specifically did you ever see the Greenwell vehicle leave the left lane?"
 
 
 68
 "A. Absolutely not."
 
 
 69
 "Q. Not until the impact?"
 
 
 70
 "A. Not until the impact and it was being dragged by the tractor over to the side because the tractor trailer was trying to get away from them.
 
 
 71
 (Tr., Vol. II, pp. 10-12) (emphasis added).
 
 II.
 
 72
 The second eyewitness, Jill Raggard Schmidt, from Louisville, Kentucky, testified as follows:
 
 
 73
 "Q. What do you recall about it?"
 
 
 74
 "A. Well, I was passing the ramp that would lead the people that were coming west on 64 up onto the Gene Snyder going south. I had just passed that ramp when I noticed a semi cab without the trailer immediately veer in front of me from the right-hand lane all the way to the far left lane. I thought that was odd because normally people stop at lanes in between changing lanes. It scared me because the weather was so bad, and I was afraid that I would lose control of my vehicle or possibly this person would hydroplane. And then he made it all the way to the far left lane and there was a big splash of water in front of him. I was still behind him in the right-hand lane. And the next thing I know he's shooting off very quickly from the left-hand lane all the way across the right hand lane off the road into the grass. There was a ditch or a dip in the grass, so he went down and up and stopped. It was very fast. I was surprised that he didn't turn over or, you know, seem to have any problem, but he came to a complete stop."
 
 
 75
 "Q. I don't want to -"
 
 
 76
 "A. He, the driver, of the semi cab."
 
 
 77
 "Q. You're talking bout the semi cab at this point?"
 
 
 78
 "A. Uh-huh."
 
 
 79
 "Q. Continue."
 
 
 80
 "A. I wanted to stop and make sure he was okay. And I began to slow down so my vision went off of him on my far right into my own lane, and then I noticed there was a vehicle or an object -- at that point I didn't know what it was -- spinning in front of me still on the highway. And I thought for a brief second, "Well, maybe this is part of his cab. Maybe this is the trailer attached to his semi." And then I remembered, no, he just had the semi cab. There was no trailer attached to it."
 
 
 81
 So I realized it was another vehicle and I knew that they wrecked and they were spinning around and they ended up hitting the guardrail. And at that point I slowed down and stopped where -- at that point was an exit ramp to the right, so there was like a little V-shape ofgrass in the road before the guardrail where they had stopped. I pulled my car off and got out and ran to the vehicle. There was two people inside: Mrs. Greenwell and her husband, and Mrs. Greenwell was alert. She was awake. She looked me and I don't remember exactly what we said, but I do remember asking if she was okay, and she said she was. She said she was very worried about her husband And at that point other people had stopped, also.
 
 
 82
 "Q. Did you ever see the Greenwell vehicle before you saw it spin in the road?"
 
 
 83
 "A. I did see an object. I was not focused on it. I knew there was something in the left-hand lane ahead of me. But I didn't really pay that much attention to it because this semi cab took my attention once it merged and immediately started over. The next time I realized there was another car was when it was spinning in front of me.
 
 
 84
 (Tr., Vol. II, pp. 24-26.)"
 
 III.
 
 85
 Elizabeth Coulston from Louisville, Kentucky, testified as follows:
 
 
 86
 "Q. Tell us what you observed that day. This was back -"
 
 
 87
 "A. I know I'm scared to death. I'm sorry. I was traveling on the Gene Snyder Freeway. It was raining. It started to rain very hard and I decided to slow down myself because in weather like that there's always an accident somewhere that happens, so I thought I'd be safe. And I looked up ahead."
 
 
 88
 "It was very difficult to see traffic to see other vehicles. And what I saw was the outline of a semi and I saw the semi go left and go around in a circle and it came back around and went off to the right and I saw a light pole, an interstate light pole snap like a toothpick. And I just kind of freaked out. "Oh, my gosh." And I pulled over and went to see if everybody was all right."
 
 
 89
 "Q. The outline of the semi, were you able to determine where you first observed this outline?"
 
 
 90
 "A. I first -- it was shortly before the ramp to the Interstate 64 to 64 east. I saw -- I could see the back end."
 
 
 91
 "Q. What lane of travel were you in?"
 
 
 92
 "A. I was in the left lane of traffic."
 
 
 93
 "Q. What did you see the tractor or this outline, what did you see it do?"
 
 
 94
 "A. I saw it from the right-hand lane that the semi was in, I saw it go left across my lane. And it just circled around and then went off the right side of the road because I was scared it wouldn't get straightened out before I got to it."
 
 
 95
 "Q. Did you see the tractor, semi enter into the left lane?"
 
 
 96
 "A. Yes, I did."
 
 
 97
 "Q. Did you ever see a silver pickup truck?"
 
 
 98
 "A. No, I did not. I never saw a vehicle in the left lane in front of me, and I'm sure it was because of the rain. I thought that the semi had just lost control and had an accident itself."
 
 
 99
 (Tr., Vol. II, pp. 35-36.)
 
 
 100
 All three eyewitnesses -- the only eyewitnesses to testify -- said basically the same thing. The semi-tractor lost control and fishtailed and lurched into the left hand lane from the right hand lane in which it was traveling. The first eyewitness who was nearest saw the semi-tractor strike the pickup truck. She was absolutely unequivocal in what she saw. Twice she told the questioner that she was "absolutely" certain that the semi-tractor left the right lane and struck the pickup truck in the left lane. The other two eyewitnesses were not as close and were hindered by the heavy rain in their vision. But they, too, saw the semi-tractor lurch from the right lane into the left lane and shortly thereafter realized that it had struck the pickup truck. It is obvious from this testimony -- notwithstanding the court's complete misinterpretation of the record -- that the jurydid not accept the consistent eyewitness testimony of the three witnesses. Rather, the jury accepted what in my opinion is the bogus, "junk science" testimony of the expert witness paid by the corporate defendant.
 
 
 101
 The outcome of this case represents a grave injustice to the family of the man killed by the negligent loss of control of the semi-tractor during a rain storm. I cannot sit idly by and watch such a grave injustice occur without registering my Dissent.
 
 
 
 NOTE:
 
 
 [1]
 Plaintiffs objected as follows:
 This analysis assumes that tractor was moving in a parallel direction on I-265.... There has been no foundation laid that the tractor trailer was moving in a parallel direction on I-265 at the time of this collision. In fact, all the evidence up this [sic] to date is that it was not moving at parallel fashion to I-265, and we need to qualify that before this is introduced, because this fellow is suggesting that both vehicles were moving in a parallel fashion along I-265, and that is not what is before this Court whatsoever, and that is not what's before this jury.... What is before the jury at this point is this brown black tractor was out of control and was fishtailing and moving side to side and moving in a circular motion trying to exit to I-64, not moving in a parallel fashion along 265.
 Tr. pp. 23-24.
 The trial Judge did not analyze the expert's testimony but then ruled as follows:
 THE COURT: I'm going to let him go ahead and testify, and you can cross-examine him on that point.
 MR. WANTLAND: I understand, Your Honor. For the record and while we're here for the record, the idea of these trucks being parallel along the highway is a fact not in evidence, and we're not qualifying this witness.
 THE COURT: Well, he's qualified.
 MR. WANTLAND: I'm saying I don't think that he's qualified to answer the question.
 THE COURT: He's qualified to testify as an expert. I'm going to let him come up with his theory. And if you think that there's some infirmity in it, then you can bring that out in cross-examination.
 Tr. p. 25 (emphasis added).