[Cite as *Clark v. Ohio Dept. of Transp.*, 2020-Ohio-5400.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Michael A. Clark, Administrator of the Estate of Brandon William Carl, Deceased, | : | |
| | : | |
| Plaintiff-Appellant, | | No. 19AP-495 |
| | : | (Ct. of Cl. No. 2015-99JD) |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Ohio Department of Transportation, | | |
| | : | |
| Defendant-Appellee. | | |
| | : | |

D E C I S I O N

Rendered on November 24, 2020

**On brief:** *D. Arthur Rabourne, L.L.C.,* and *D. Arthur Rabourne*; *Law of Office of Terrence L. Goodman, LLC*, and *Terrence L. Goodman*, for appellant.

**On brief:** *Dave Yost*, Attorney General, *Peter E. DeMarco* and *William C. Becker*, for appellee.

APPEAL from the Court of Claims of Ohio

KLATT, J.

{¶ 1} Plaintiff-appellant, Michael A. Clark, administrator of the estate of Brandon William Carl, appeals from a judgment of the Court of Claims of Ohio that granted summary judgment to defendant-appellee, the Ohio Department of Transportation ("ODOT"), and denied partial summary judgment to Clark. For the following reasons, we affirm the trial court's judgment.

{¶ 2} In 2012, ODOT issued construction plans and solicited bids for a significant interstate improvement project in the Cincinnati area. The project included the widening

of I-75 and the reconstruction of the I-75 interchange with Hopple Street. The winning bidder, Kokosing Construction Company, Inc., executed a contract with ODOT on January 18, 2013 to complete the I-75 project. In the contract, Kokosing agreed that it was contractually bound by the construction plans ODOT had issued.

{¶ 3} The final stage of the I-75 project included the demolition of the existing I-75 northbound exit ramp to Hopple Street once the construction of the new interchange rendered the existing ramp defunct. Using that ramp, traffic exited from the left side of I-75 northbound, crossed a bridge that extended over I-75 southbound, and turned onto Hopple Street. The ramp bridge had a concrete deck, or surface, supported by steel girders, or beams. The bridge consisted of three spans: a 55-foot east span, a 73.5-foot center span, and a 49.5-foot west span. Each span had five girders. Four structures provided the bridge with vertical support: an abutment on the east end of the bridge, a pier on the east side of I-75 southbound, a pier on the west side of I-75 southbound, and an abutment on the west end of the bridge. Both the east and west spans were cantilevered: the girders of the east span extended 9 feet over the east pier and the girders of the west span extended 9.5 feet over the west pier. The cantilevered girders terminated with horizontal ledges extending from the bottom half of the girders, forming "seats," and the center girders terminated with horizontal ledges extending from the top of the girders, which rested on the "seats." Through these points of connection, called hinges, the east and west spans supported the center span. Given this configuration—two cantilevered spans supporting a center suspended span through hinges—the bridge was a double-hinged cantilevered suspended bridge.

{¶ 4} In November 2014, Kokosing's project engineer asked a Kokosing design engineer to develop a demolition plan for the ramp bridge. The design engineer did so. Upon receipt of the demolition plan, Kokosing management discussed how to implement it during their weekly job-site meetings. Kokosing management had multiple decisions to make. First, they had to determine the method they would use to remove the bridge deck. Kokosing management decided to use a Komatsu excavator PC-400 with a Genesis LXP4000 attachment, which pulverizes concrete and shears steel rebar, reducing a bridge deck to rubble. Second, because the demolition plan did not contain a sequence for dismantling the deck, Kokosing management had to determine the order in which the

excavator would accomplish the deck removal. At the job-site meetings, Kokosing management decided that the excavator would begin demolishing the deck on the east side of the bridge and finish on the west side. Kokosing management made that decision based on the ability and ease of the excavator to access and depart the job site.

{¶ 5} On the night of January 18, 2015, a Kokosing construction crew began to demolish the bridge. The excavator started pulverizing the deck beginning at the east abutment of the bridge and working west toward the east pier. Chunks of concrete and pieces of rebar fell through the bridge girders to the ground. After dismantling approximately 50 percent of the deck between the east abutment and east pier, the excavator operator noticed that the girders of the east span were lifting about one foot off their bearings on the east abutment. The Kokosing crew stopped work for the night, and the Kokosing field engineer sent the design engineer an email asking whether it was safe to continue demolition. In response, the Kokosing design engineer designed a tie-down plan, which used Hilti anchors to attach the east span girders to the east abutment wall.

{¶ 6} When the Kokosing demolition crew returned for work on the night of January 19, 2015, the Hilti anchors were installed, securing the girders to the abutment. Recommencing the demolition work, the excavator operator used the Genesis attachment to dismantle the remainder of the deck between the east abutment and east hinge point, which was located nine feet to the west of the east pier. At that point, no deck held the east span girders down. When the excavator moved onto the center span, the weight of the excavator exerted a substantial downward force on the east span girders, which supported the center span girders at the hinges. Without the deck to hold the girders in place, the east span became a gigantic teeter-totter, with the east pier acting as the fulcrum. The weight of the excavator pushed the cantilevered end down and the east span girders straight up.[1] As the east span tilted up, the east hinges failed, leaving the center girders without support on the east side. This caused the east side of the center span to fall, which resulted in the center girders pulling off the west hinges and the center span falling on the west side as well. The entire center span collapsed in one piece onto I-75 southbound.

---

[1] The Hilti anchors that secured the east span girders to the east abutment wall did not work as intended by the design engineer. They failed either by pulling out of the concrete or failing in shear.

{¶ 7} At the time of the collapse, Brandon Carl, a Kokosing labor foreman, was standing on the bridge approximately 20 to 25 feet to the west of the excavator. Carl was working as a "spotter," which required him to observe operations to ensure demolition debris did not endanger traffic on I-75 and, when necessary, to use a flashlight to signal the excavator operator to stop demolition. When the center span collapsed, Carl fell underneath the excavator, and it crushed him.

{¶ 8} On February 9, 2015, Sharon Frye and Charles Carl, then co-administrators of Brandon Carl's estate, brought suit against ODOT. The complaint asserted wrongful death and survivorship claims predicated on negligence and breach of warranty. Frye and Charles Carl subsequently resigned as co-administrators, and Clark became the administrator of Carl's estate. Consequently, the trial court substituted Clark as plaintiff.

{¶ 9} ODOT moved for summary judgment in its favor, arguing that it owed no duty of care or protection to Carl. ODOT relied on the general principle that an entity—such as ODOT—that hires an independent contractor—such as Kokosing—bears no liability for work-related injuries the independent contractor's employees may suffer while engaged in an inherently dangerous job—such as demolition. In response, plaintiff argued that the exception to the general rule of nonliability applied. Under that exception, a duty arises to take reasonable steps to eliminate the injury-causing hazard if the hiring entity actively participates in the job operation. Plaintiff contended that ODOT actively participated in the demolition of the bridge because it restricted Kokosing's ability to close I-75. According to plaintiff, this restriction forced Kokosing to start demolition at the east abutment. Plaintiff's expert witness opined that, if Kokosing had initiated demolition in the middle of the bridge, no collapse would have occurred. Plaintiff subsequently moved for partial summary judgment, again setting forth this argument. ODOT opposed that motion.

{¶ 10} On July 10, 2019, the trial court granted summary judgment to ODOT and denied summary judgment to plaintiff. Plaintiff now appeals this judgment, and he assigns the following errors:

> [1.] The trial court erred when it failed to apply the contract and found that "ODOT did not retain control over any critical variable."
>
> [2.] The trial court erred when the trial court discounted Plaintiff's experts' affidavits and found that Plaintiff's experts'

affidavits were conclusory bare contradictions unsupported by any evidence.

{¶ 11} A trial court must grant summary judgment under Civ.R. 56 when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, LLC*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 12} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making conclusory allegations. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* If the moving party meets its burden, then the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293. If the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Dresher* at 293.

{¶ 13} By his first assignment of error, plaintiff argues that the trial court erred in determining that ODOT did not actively participate in the demolition of the bridge. We disagree.

{¶ 14} Generally, an entity that hires an independent contractor to perform inherently dangerous work owes no duty of care to the independent contractor's employees. *Wellman v. E. Ohio Gas Co.*, 160 Ohio St. 103 (1953), paragraph two of the syllabus. Therefore, "[w]here an independent contractor undertakes to do work for another in the

very doing of which there are elements of real or potential danger and one of such contractor's employees is injured * * *, no liability for such injury ordinarily attaches to the one who engaged the services of the independent contractor." *Id.* at paragraph one of the syllabus. The primary responsibility for protecting the independent contractor's employees rests with the independent contractor, not the entity that hired the independent contractor. *Eicher v. United States Steel Corp.*, 32 Ohio St.3d 248, 250 (1987).

{¶ 15} An exception to this general rule arises when the hiring entity actively participates in the job operation performed by the independent contractor. *Hirschbach v. Cincinnati Gas & Elec. Co.*, 6 Ohio St.3d 206 (1983), syllabus. If the hiring entity actively participates in the independent contractor's work, the hiring entity will be liable for failing to eliminate a hazard that he could have eliminated through the exercise of ordinary care. *Id.* A hiring entity actively participates in the independent contractor's work when it: (1) directs the activity resulting in the employee's injury, (2) gives or denies permission for the critical acts that led to the employee's injury, or (3) retains or exercises control over a critical variable in the workplace that causes the employee's injury. *Patterson v. Adleta, Inc.*, 1st Dist. No. C-180015, 2018-Ohio-3896, ¶ 15; *Evans v. Dayton Power & Light Co.*, 4th Dist. No. 03CA763, 2004-Ohio-2183, ¶ 33. In the first two circumstances, active participation arises due to the hiring entity's control over work activities, while in the third circumstance a hiring entity actively participates because of its control over the work area. *Sopkovich v. Ohio Edison Co.*, 81 Ohio St.3d 628, 642-43 (1998).

{¶ 16} Work is inherently dangerous if danger is necessarily present because of the nature of the work, and the risk involved in performing the work is or should be apparent. *Frost v. Dayton Power & Light Co.*, 138 Ohio App.3d 182, 198 (4th Dist.2000), *amended by* 4th Dist. No. 98 CA 669 (July 26, 2000). Here, neither ODOT nor plaintiff dispute that demolition of a bridge meets this test. Likewise, neither ODOT nor plaintiff dispute that Kokosing was an independent contractor hired by ODOT to demolish the bridge, or that Carl was Kokosing's employee. Consequently, under Ohio law, ODOT is not liable for Carl's death unless it actively participated in the demolition of the bridge.

{¶ 17} Plaintiff contends that ODOT actively participated in the demolition of the bridge because it controlled a critical variable in the workplace that caused Carl's death; namely, it restricted the closure of lanes of traffic on I-75. ODOT did, indeed, possess

control over lanes closures on I-75. In Note No. 82 of the construction plans, ODOT required the contractor hired to complete the I-75 project to "maintain a minimum of 3 lanes of traffic on I-75 in each direction at all times except when a lane(s) may be closed to traffic per the permitted lane closure schedule." (Ex. 64, Tuminello Dep.) However, prior to awarding the contract, ODOT issued Addendum No. 3, which revised Note No. 82. Addendum No. 3 deleted the three-lane minimum and replaced it with the requirement that "[t]he contractor shall maintain the same number of lanes in each direction as currently exist[s] on I-75 at all times except when lane(s) closure is permitted * * *." (Ex. 8, Wessels Dep.) Addendum No. 3 further provided that:

> SHORT TERM LANE CLOSURES SHALL ONLY BE IMPLEMENTED WHEN WORK IS BEING CONTINUOUSLY PERFORMED IN THE LANE. THE CLOSURE SHALL BE REMOVED AS SOON AS POSSIBLE AFTER WORK HAS STOPPED. PERMITTED LANE CLOSURES ON I-75 SHALL ONLY BE ALLOWED DURING THE TIMES SPECIFIED IN THE DISTRICT 8, PERMITTED LANE CLOSURES TIMES SCHEDULE[,] WHICH IS LOCATED ON THE ODOT WEBSITE[.]

*Id.* If the contractor failed to reopen a lane to traffic by the time specified in the permitted lane closures time schedule, ODOT could assess a $3,000 disincentive for each 15 minutes the lane remained closed.

{¶ 18} The record does not include the permitted lane closures time schedule that Addendum No. 3 referred to. Consequently, there is no evidence regarding the number of lanes that the contractor could close at one time or the hours during which the closures could occur. However, given that ODOT cooperated with Kokosing in closing two lanes of I-75 southbound for the demolition of the ramp bridge, we surmise that the schedule permitted the closure of at least two lanes of the highway overnight. *See* Ex. 51, Mary Dep. (notice that ODOT issued to the public warning of nightly double-lane closures the week of January 18 for the demolition of the ramp bridge).

{¶ 19} Additionally, in Addendum No. 3, ODOT allowed the complete closure of I-75 for up to 30 minutes between midnight and 5:00 a.m. for the contractor to erect or remove structural steel bridge girders. Failure to timely reopen subjected the contractor to a disincentive of $100 for each one minute of additional closure time.

{¶ 20} Plaintiff asserts that ODOT's restrictions on closing lanes of traffic on I-75 forced Kokosing to begin removing the bridge deck at the east abutment. Plaintiff's expert witness, Herbert Bill, testified that "[t]he inability to stop traffic, even for demolition, for extended periods dictated that Kokosing start the demolition from the east end and move toward the west." (Bill Aff. at ¶ 14.) Additionally, Bill also stated that "[t]he ODOT mandate to maintain traffic * * * compelled Kokosing to start the demolition at the ends rather than the center span" and "[t]he decision from ODOT to maintain steady traffic beneath the bridge forced Kokosing to start the demolition from the east end and work toward the center." *Id.* at ¶ 16.

{¶ 21} The east-to-west approach, Bill opined, resulted in the collapse of the bridge. "[T]he safe method to demolish a double[-]hinged bridge is to start the demolition with the center span. By starting with the center span, the ends of the bridge, which support the center span, will remain stable while they rest on the abutment[s] and pier[s]." *Id.* at ¶ 15. In other words, to maintain the stability of the bridge, demolition of the deck should have begun with the center suspended span, which had no vertical support, and then moved to the ends.

{¶ 22} In sum, Bill concluded that, because ODOT's lane closure restrictions compelled Kokosing to adopt the east-to-west sequence of demolition, those restrictions constituted a critical variable that caused the collapse of the bridge and Carl's death. Bill opined:

> The traffic rules that ODOT required and controlled resulted in demolition by ODOT and Kokosing of the bridge in the wrong order. By demolishing the bridge in the wrong order the bridge became unstable and collapsed.

*Id.* at ¶ 20(D).

{¶ 23} Bill's opinion regarding ODOT's active participation rests on his assertion that the restrictions on lane closures forced Kokosing to begin the deck removal at the east abutment. Bill's rendition of the facts, however, conflicts with the evidence. On-site Kokosing management determined the order in which the Kokosing crew would dismantle the deck because the demolition plan did not specify a deck removal sequence. Michael Schweer, the Kokosing field engineer on the I-75 project, testified as follows regarding management's decision:

A. We decided we would start on the east abutment and work our way to the west abutment.

Q. Why was that decision made?

A. The decision was made based on the fact that if the machine started, the excavator started on the east side, it would finish on the west side.

Q. What was the importance of the machine starting on the east side?

A. Accessibility.

Q. Did the phrase * * * "maintenance of traffic" ever come into those discussions?

A. No.

Q. How about if I break it down and define it as keeping lanes of travel open?

A. No. Based on the sequence of the way we took the deck off, no.

Q. So the focus, at least in those meetings that you had, had to do with simply getting the machinery over to the east side, working toward the west, so you would be able to get it off, correct, sir?

A. Correct.

(Schweer Dep. at 87-88.) Consequently, the logistics of moving the excavator and its attachment, and not lane closure restrictions, determined the order of the deck removal.

{¶ 24} Expert testimony offered in support of or in opposition to summary judgment must comply with Civ.R. 56 as well as the evidence rules governing expert opinion testimony. *Natoli v. Massillon Community Hosp.*, 179 Ohio App.3d 783, 2008-Ohio-6258, ¶ 26 (5th Dist.2008). Pursuant to Evid.R. 703, the facts on which an expert bases his opinion may be perceived by him or admitted into evidence. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 616 (1998). "Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony contradict the evidence." *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir.1999); *accord Billups v. Libbey Glass, Inc.*, 6th Dist.

No. L-07-1228, 2008-Ohio-715, ¶ 32 (affirming the trial court's decision to disregard an expert witness' affidavit because the expert "based part of his opinion on a claimed fact that was contrary to the record"); *State Farm Fire & Cas. Co. v. Holland*, 12th Dist. No. CA2007-08-025, 2008-Ohio-4436, ¶ 28 (concluding the trial court could have excluded expert witnesses' opinions because they "were based upon unsubstantiated facts directly contradicted by eye witnesses").

{¶ 25} Here, of all the witnesses, only Schweer had personal knowledge about the reason Kokosing started the deck removal at the east abutment. Schweer explicitly denied that "keeping lanes of travel open" played any role in the determination of the removal sequence. (Schweer Dep. at 88.) Consequently, in forming his expert opinion, Bill could not rely on the "fact" that lane closure restrictions forced Kokosing to dismantle the bridge's deck in an east-to-west order. Because Bill based his opinion on facts contradicted by the evidence, his testimony is inadmissible.

{¶ 26} Plaintiff also relies on the deposition testimony of Bret Murray, the Kokosing design engineer, to assert that the lane closure restrictions dictated the east-to-west order of deck removal. During Murray's deposition, plaintiff's attorney asked him, "[I]f the contract [maintenance of traffic rules] do[ ] not allow for closing [the highway to] traffic, then you could not take down the suspended span first, correct, sir?" (Murray Dep. at 176.) Murray answered, "You could conclude that." *Id.* Murray, however, refused to concede that "[y]ou would have to conclude that." *Id.* As Murray explained, "[t]he entire span is not coming down at any single time. Thus, traffic can be shifted and lanes can be closed." *Id.* at 177. Only "lanes directly underneath" the excavator's work area "would be closed." *Id.* at 179. In other words, to demolish the center span first, the Kokosing crew could close lanes directly beneath the area being demolished and change which lanes it closed as the work progressed to a different area. Given the totality of Murray's testimony, we do not interpret it as supporting plaintiff's interpretation that the lane closure restrictions dictated the order of demolition.

{¶ 27} In the end, the parties do not dispute that the bridge collapsed because Kokosing began the deck removal with the east span instead of the center span. Whether ODOT had control over a critical variable in this case turns on why Kokosing started with the east span. The record establishes that Kokosing began demolition at the east abutment

because that location was most accessible to the excavator.  ODOT's limitations on closing lanes of traffic on I-75 played no part in Kokosing's sequencing of the deck removal, so they were not a critical variable in causing the bridge collapse.  Accordingly, we overrule the first assignment of error.

{¶ 28}  By the second assignment of error, plaintiff argues that the trial court erred by disregarding Bill's testimony.  For the reasons we stated in resolving the first assignment of error, we overrule this assignment of error as well.

{¶ 29}  In conclusion, we overrule both of plaintiff's assignments of error, and we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

SADLER, P.J., and BROWN, J., concur.

———————————————