**UNITED STATES of America**

v.

**Dennis POLLARD.**

**No. 3:00–CR–67.**

United States District Court,
E.D. Tennessee,
at Knoxville.

Jan. 24, 2001.

Nancy Stallard Harr, U.S. Department of Justice, Office of U.S. Attorney, Knoxville, TN, for U.S.

Kenneth F Irvine, Jr., Eldridge, Irvine & Hendricks, Knoxville, TN, for Dennis Pollard.

### ORDER

JARVIS, District Judge.

On November 29, 2000, the Honorable Thomas W. Phillips, United States Magistrate Judge, filed a 42–page Report and Recommendation (R & R) [Doc. 38] in which he recommended that this court find Dr. Bruce Woodling to be a qualified expert witness in the area of pubertal development of children and that his expert opinions be fully admissible at trial. Judge Phillips made his recommendation after conducting a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

This matter is presently before the court on defendant's timely objections to the R & R [*see* Doc. 40], as well as the government's response thereto [*see* Doc. 41]. As required by 28 U.S.C. § 636(b)(1), the court has now made a *de novo* determination of those portions of the R & R to which defendant objects. In doing so, the court has also viewed the videotape which is the subject matter of this litigation. The court observes that Judge Phillips has thoroughly and exhaustively analyzed each of the issues now raised by the defendant. Consequently, any further comment by this court would be duplicitous and unnecessary. Suffice it to say, the court finds itself in complete agreement with Judge Phillips' analysis and his conclusions.

Accordingly, defendant's objections [Doc. 40] are hereby OVERRULED in their entirety whereby the R & R [Doc. 38] is ACCEPTED IN WHOLE. Therefore, Dr. Woodling will be allowed to testify as a qualified expert during the trial of this case.

### REPORT AND RECOMMENDATION

PHILLIPS, United States Magistrate Judge.

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and the rules of this court for disposition or for a report and recommendation as appropriate. Defendant has filed a motion for a *Daubert* hearing, seeking to exclude the opinion testimony of the government's two expert witnesses, which shall be addressed in this report and recommendation.

In his motion for *Daubert* hearing, defendant has moved the court for an order to determine the admissibility of the opinion testimony of two of the witnesses listed by the prosecution as "expert" witnesses. In a pleading entitled, "Notice of Expert Testimony," the prosecution submits that it will seek to introduce expert testimony from four individuals as expert testimony. Two of these proposed experts, and their areas of expertise, are: (1) Dr. Bruce Woodling, who will testify as to the age of the young lady in the video to a reasonable medical certainty based upon his training and experience; and (2) S.A. Tammi Reiley, who will testify as a expert in the field of child erotica.

Defendant also states that the government has submitted a statement of qualifications and a report for Dr. Woodling, but there has not been a statement of qualifications or report for S.A. Reiley in her alleged field of expertise. Pursuant to the holdings of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), and their progeny, defendant states that he is entitled to a hearing on the admissibility of this testimony [Doc. 206].

In his memorandum in support of his motion for *Daubert* hearing, defendant points out that the United States Supreme Court has adopted a reliability test for determining the admissibility of scientific evidence.

In interpreting Rule 702, Federal Rules of Evidence, the United States Supreme Court related that in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method and proposed testimony must be supported by appropriate validation, i.e., "good grounds" based on what is known. In short, the Supreme Court ruled, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability. *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786.

Defendant points out that the *Daubert* court enunciated a two-prong test for trial courts to use when assessing the admissibility of expert testimony. The first prong of the test involves a determination of whether the proffered expert testimony is based on a methodology that is "scientific" and therefore reliable. The Court noted that the word "knowledge" connotes more

than subjective belief or unsupported speculation. Both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted, and the Sixth Circuit has previously instructed trial courts to take a "hard look" at the basis for the expert's scientific opinions. *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1352 (6th Cir.1992).

Defendant states that although *Daubert* dealt exclusively with "scientific" knowledge, the Supreme Court subsequently ruled in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), that the gatekeeping obligation placed upon the trial court pursuant to *Daubert* applied not only to scientific testimony but also to testimony based on "technical" and "other specialized knowledge." Defendant points out that in the past, some jurisdictions have allowed proponents to escape from any fundamental reliability requirements by characterizing the expert testimony as "non-scientific" evidence, and *Kumho Tire* closed this escape hatch. Thus, the defendant states, the *Daubert/Kumho* reliability test would apply not only to the "scientific" experts listed by the prosecution, but would also apply to the proffered testimony of Dr. Woodling and S.A. Reiley.

Finally, the defendant points out, as the Sixth Circuit has ruled, "[t]he party seeking to have the testimony admitted bears that burden of showing 'that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology.'" *Smelser v. Norfolk Southern Railway Co.,* 105 F.3d 299, 303 (6th Cir.) *cert. denied,* 522 U.S. 817, 118 S.Ct. 67, 139 L.Ed.2d 29 (1997) (*citing Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir.1995)). Therefore, defendant concludes, the court should exercise its gatekeeping role in this case and determine, as a threshold matter, whether the reliability requirement has been met [Doc. 27].

The government has responded to the defendant's motion for a hearing to determine the admissibility of expert evidence that it will offer the testimony of only two expert witnesses: Bruce A. Woodling, M.D., and Patricia Manzolillo, a forensic document analyst. The government will not offer expert testimony on child erotica as previously indicated, the government states, and the defendant has not challenged the qualifications of Ms. Manzolillo. The only inquiry remaining is whether Dr. Woodling has "scientific, technical or other specialized knowledge [which] will assist the trier of fact to ... determine a fact in issue" as set forth in Rule 702, Federal Rules of Evidence.

The government states that the fact in issue in this case is the apparent age of the female depicted in a video tape entitled "Sucking Daddy," subsequently referred to as "Fun with Daddy." A jury, as trier of fact, may determine the age of the child depicted in an alleged child pornography video, the government notes. *United States v. Broyles,* 37 F.3d 1314, 1318 (8th Cir.1994), *United States v. Hilton,* 167 F.3d 61 (1st Cir.1999). In the case before the court, the government states, an expert will be proffered because the video tape is an older one, which is therefore of less clarity. In such a case, an expert would be of assistance to the trier of fact.

The government states that the type of evidence which might be admissible for the apparent age of a person shown in a visual depiction was addressed in the case of *United States v. Hilton,* 167 F.3d 61 (1st Cir.1999): "[T]he physical characteristics of the person; expert testimony as to the physical development of the depicted person; how the disk, file, or video was labeled or marked by the creator or the distributor of the image, or the defendant himself ... and the manner in which the image was described, displayed, or advertised." *Id.* at 75. Dr. Woodling is a medical doctor with extensive experience and training in medical care for children, the government states and various circuits, including our own Sixth Circuit, have admitted the testimony of medical doctors and

others to determine the age of a person shown in a visual depiction. *Connection Distributing Co. v. Reno,* 154 F.3d 281 (6th Cir.1998) (director of clinical affairs of the Division of Adolescent Medicine); *United States v. Long,* 1997 WL 130079 (6th Cir. Mar.19, 1997) (pediatrician, medical doctor, and forensic psychiatrist); *United States v. Snow,* 1990 WL 171572 (6th Cir. Nov.7, 1990) (forensic pathologist based upon medical opinion); *United States v. Hilton,* 2000 WL 894679 (D.Maine June 30, 2000) (licensed pediatrician); *United States v. Broyles,* 37 F.3d 1314 (8th Cir.1994) (pediatric endocrinologist, and postal inspector with skilled lay testimony provided adequate basis for the testimony).

The government concedes that the inquiry must turn on the requirements of the decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The government suggests that *Daubert* set forth considerations for judges to consider in admitting scientific evidence, and *Kumho Tire* explained that the court's "gatekeeping" role was not to exclude all expert evidence which was not based upon scientific methods, but that Rules 702 and 703 "grant all expert witnesses, not just 'scientific' ones, testimonial latitude unavailable to other witnesses on the assumption that the expert opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* at 138, 119 S.Ct. 1167. The trial judge is granted "broad latitude" to determine whether *Daubert's* specific factors "are or are not reasonable measures of reliability in a particular case," the government argues, and a reading of *United States v. Jones,* F.3d 1147 (6th Cir.1997), together with *Kumho Tire,* clearly shows that the trial judge may determine whether *Daubert* factors would apply, but if they do not, the expert is not automatically expelled from the case. "[T]he test of reliability is 'flexible' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts in every case." *Kumho Tire,* 526

U.S. at 142, 119 S.Ct. 1167. The government further points out that the notes to Rule 702 anticipate the qualification of physicians as experts:

> The expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training, or education." Thus, within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects....

Rule 702, Federal Rules of Evidence.

The government states that the testimony of Dr. Woodling is based upon his medical training and years of experience evaluating and treating children of a variety of ethnic and racial backgrounds. His testimony would be sufficiently relevant and reliable based upon his knowledge and experience in his discipline to qualify him as an expert as to the questioned age of the purported child in the video tape which is the subject of this case. *United States v. Jones,* 107 F.3d 1147, 1156 (6th Cir.1997) [Doc. 29].

### DAUBERT HEARING

A *Daubert* hearing was held in this case on September 25, 2000, at which time the government first produced the testimony of Bob Richardson, a Special Agent with the United States Customs Service. Agent Richardson testified as to the chain of custody for the video tape alleged by the government to be child pornography, and the video tape in question was introduced into evidence (Gov't Ex. 1). Agent Richardson testified that a copy of the video tape was sent to Dr. Woodling for his examination.

The government next presented the testimony of Bruce A. Woodling, M.D., a licensed physician in the state of California who testified that he received his medical degree from the University of Southern California School of Medicine in 1972, completed an eighteen month initial residency in obstetrics and gynecology at the L.A. County USC Medical Center, then entered a family practice residency in Ventura,

California, graduating from that residency in 1975. Dr. Woodling was board certified by the American Academy of Family Practice and has been subsequently re-certified by that organization. Dr. Woodling testified that beginning in the early 1970s, he developed a special interest in dealing with the issues of child abuse and sexual abuse of adult women and children and attended conferences relating to forensic medicine dealing with that speciality. In the mid-1980s, Dr. Woodling was appointed by the governor of the state of California to head the office of Criminal Justice Planning Committee for developing a protocol for the state of California. That protocol became the model protocol for the United States and resulted in the National Clearing House for Child Abuse and Neglect.

Dr. Woodling testified further that he was a founding director of the American Professional Society for the Abuse of Children and has been a member for more than twenty years of the International Society for the Prevention of Child Abuse and Neglect. Dr. Woodling testified further that he has written extensively in the areas of child and sex abuse, has been a member of the task force of the American Medical Association that deals with standards in the assessment of sexual abuse and child abuse and has been an advisor and chair of the committee for the state of California that deals with guidelines and protocol for assessing sexual abuse.

Counsel for defendant was permitted to voir dire Dr. Woodling, and after the voir dire of Dr. Woodling was completed, the court found Dr. Woodling to be qualified to give expert testimony in the matter of child sexual abuse.

Thereafter, Dr. Woodling testified that he had reviewed the video tape referred to as "Fun with Daddy" and "Sucking Daddy," and related that he originally viewed the video tape during a consultation that he provided for the Department of Customs. Dr. Woodling testified that he viewed a series of videos that were part of the library maintained by the Department of Customs which the Customs Service used in their operations. Dr. Woodling originally examined the video in either 1997 or 1998, and related that he had worked with the Department of Customs since about 1996. Dr. Woodling related that he had reviewed with the special agents and the custodian of their library about thirty videos considered to be child pornography. In making his review of the videos, Dr. Woodling testified that he drew upon his training and experience to determine the approximate age of the persons involved in the videos. The tools that he used in making the assessments during his original consultation with the U.S. Department of Treasury, Bureau of Customs, was basically the clinical milestones that are used in medicine to determine the age of a child and to see if the examination is consistent with the known age as it relates to what the medical profession considers to be milestones.

Dr. Woodling further testified that in determining whether an individual is under the age of eighteen, there are a number of milestones he uses to determine age. First of all, he draws upon his clinical experience in having seen many thousands of children and young ladies, he draws upon his understanding of predictable events or milestones that occur during sexual development, and he draws upon the milestones related to change in body habitus or body configuration, changes in the anatomy and morphology or the structure of the breasts and changes in the development, anatomy and structure of the pubic region. Dr. Woodling testified that these are areas that have been investigated by a number of people over the years and have been memorialized in the medical literature, beginning in the 1940s by Dr. Tanner, who is still living and working today. Dr. Tanner developed what is called the Tanner Scale which is used by every physician who deals with growth and development during adolescence. It is one milestone used to correlate whether a child is or is not on track as it relates to his growth and development with regard to structure and also with regard to matura-

tion of the reproductive organs and it is used by clinicians, pediatricians, and endocrinologists for assessing when something goes awry and needs to be corrected.

Dr. Woodling further testified that research in this area has also been conducted by Drs. Brookman, Copeland, and others. Dr. Woodling testified that he was very familiar with the scholarly literature in this area and explained how he goes about determining the age of children when the chronological age of the child is not known.

> When physicians make assessments of where a person is in their development, it's based upon a totality that includes this clinical impression where you look at the way a body appears. And most people, if they were to look at, as an example, a nude child anywhere from age seven to age 16, they would have a feeling for how old that child is, and it's because they've seen many children.

> But what doctors use is something much more specific than that general feeling. They use, for instance, the presence or absence of a particular distribution of body fat. They utilize height as it relates to potential. And we know these—usually when we see a child, it's really simple on age. You say, how old are you, and when we are assessing age without that capability is when we can't ask that basic question.

> So we have to look at the findings, and make an estimation, which is certainly not accurate to the day, but it is accurate to a period of development, and that's what I talk about when I say the aging of a child based upon physical parameters.

Q. One of the terms that, before we get to your report, but while we were talking about habitus, is lordosis. Could you explain to the court what lordosis is?

A. Children, especially young girls, when they go through the early developmental period between about age seven and age 12 to 13 years, have a prominent lordosis or a titling of the lower spine that throws the abdomen forward and the hips back. It's a characteristic that we see of what we call pre-pubescent and early pubescent girls.

This is something that girls literally change in their anatomy as they pass through their maximum growth spurt or height velocity, and that occurs between about—between age 11 and 13. And so when you see a child that has a prominent lordosis, you know that she is in that younger age range.

Q. Are there other physical or anatomical milestones or indicia that you would take into account?

A. One of those criteria that we look at with young children is the distribution of body fat, and we look at the distribution of body fat as it relates to the appearance of structures like the hips. And in children who are pre-pubescent or in early pubescence, what you find is a distribution of baby fat that's present around the face and the torso, and it usually spares the lower extremities. These children that have that baby fat distribution have what we consider to be narrow or non-gynecoid hips.

And when you talk about the adult figure of a young woman that's like a coke bottle, that's what happens after you have pubescent development. It's not what you have in early development.

Q. And are those changes triggered by something medically that would cause those changes in the child's body?

A. Yes.

Q. What would that be?

A. By the sequential release of hormones, and the dominant hormone in females for the development of fat distribution and the development of a gynecoid or a female body habitus is estrogen.

Q. And again are all of these estrogen-related body changes intertwined? Do all of these go together to form a cohesive method for determining whether the person who is being examined clinically is developing on time or within the normal bell-shaped curve and standard deviation?

A. Yes.

Dr. Woodling further explained that a controversy has arisen regarding the Tanner Scale inasmuch as Dr. Tanner and his colleague, Dr. Rosenblum had written a letter to the *Pediatrics* magazine regarding the use of the Tanner Scale in determining the age of a child in child pornography situations. Drs. Tanner and Rosenblum stated in that letter that chronologic age cannot be accurately determined by a Tanner staging. Dr. Woodling further testified, however, that it was a consensus among physicians using the Tanner Scale that the scale is widely used with other criteria and that those criteria, along with the Tanner Scale, are very useful in determining the approximate age of a pubescent boy or girl.

In a subsequent letter to the journal *Pediatrics*, Dr. Rosenblum agreed with the consensus of the physicians that the Tanner Scale could be used as a developmental milestone along with the other milestones testified to by Dr. Woodling. The government introduced as exhibits to Dr. Woodling's testimony his CV (Gov't Ex. 2), a publication of Dr. Tanner (Gov't Ex. 3), and excerpts from the journal *Pediatrics* (Gov't Ex. 4).

Dr. Woodling then related that after reviewing the video tape in question, he provided to the court an affidavit and attestation, dated August 3, 2000, and admitted as an exhibit to his testimony as Gov't Ex. 5. Dr. Woodling went through his affidavit and attestation in considerable detail setting forth his findings after reviewing the video tape in question. Dr. Woodling's testimony was supplemented by a chart dealing with the assessment of pubertal development (Gov't Ex. 6), a guide to women's health (Gov't Ex. 7), and by scientific tables (Gov't Ex. 8). The video tape was then played in open court and Dr. Woodling testified that it was the same video tape which he had reviewed. Based upon his review of the video tape, Dr. Woodling testified as to the milestones he had observed in reaching his conclusions.

A. Yes. First, the girl who's depicted in the—whose image is depicted in the video has not reached her maximum stature, and she's smaller than she would become with age. She had an early pubescent body habitus and shape. She had not had a significant period of estrogenization of her body to have her adult habitus of late puberty, and she had a distribution of what people commonly refer to as baby fat around her torso and her face with what you would call muscular legs. That is what you see in early pubescent girls.

She also had mounding of her breasts that was in what we would describe as a sexual maturation rate three or a Tanner three, and she had changes in her pubic hair that were between a late Tanner two to a Tanner three with evolution or growing of the labia toward maturity, but not at maturity.

Q. How could you tell that?

A. In several shots where the labia were retracted you could see some pigmentation to the labia minora, you could see hair along the margins of the labia without extension up onto the mons or the supra pubic zone or out onto the thighs or in the perianal area, pretty typical of what I would call a Tanner three.

It was definitely not a Tanner or SMR four pubic hair, and the body habitus, the statute, the weight, the fat distribution, the breast mounding, the pubic hair and the actual genital anatomy are consistent with a female child between the ages of ten and 12, the maximum 12.5 years, in my clinical opinion.

Q. What will happen to this child's body in the future?

A. The hips will significantly enlarge, the torso and legs will elongate, the head will become slightly larger. The fat distribution about the face and the mid-portion of the torso will likely decrease, and height will increase by probably 20 per cent and weight 30 to 40 per cent.

Q. What about her torso? What will happen to it?

A. It will lengthen out and she'll develop a more significant breast that you saw in the video and the—

Q. Were her breasts ptotic?

A. No, they weren't. The didn't move. They were mounds.

Q. And what about the lordosis that you described?

A. The lordosis was prominent and consistent with that early pubescent stature of a child.

On cross-examination, Dr. Woodling testified that he had no information about the actors performing in the video, did not know the identity of the male actor, and had no information about the identity of the female actor. Dr. Woodling had no information about the female actor's age except for his own viewing of the video tape, did not have any information about her actual ethnic background, and was not provided any information about any special effects that might have been used in making the film. Dr. Woodling related that he was not given any information about special effects which might have been used to make the female actor appear younger than she actually was, and acknowledged that some actions can be taken to make an actor or actress appear younger than his or her chronologic age. Dr. Woodling related that he saw no evidence that attempts had been made to make the actress appear to be younger than her actual age.

In addition, Dr. Woodling testified that he based his opinions not only upon his visual examination of the actress' body, but also upon the spontaneous behaviors of the actress. These spontaneous behaviors are the way a child moves, the way a child adjusts herself, and the behaviors manifested by the young girl on the film indicated she was quite young. "They have to do in part with the way she positions herself, they have to do with her actual attitude and demeanor and the way she would stand. These are very typical pre-pubertal spontaneous movements and behaviors." Dr. Woodling related that this is a tool that he utilizes as a clinician and which he uses every day in his practice of medicine.

Dr. Woodling was further cross-examined about the letter from Drs. Tanner and Rosenblum in regard to the misuse of Tanner puberty stages, and the defendant introduced into evidence as a part of his cross-examination the articles on the use of the Tanner puberty stages (Def.Exs. 1 & 2). Dr. Woodling explained that the letters stated that using Tanner stages as the only determinate of chronological age was an illegitimate use of the Tanner Scale, but further explained that it was medically acceptable to use Tanner staging as a global part of his assessment for land marking events. Dr. Woodling further testified that Tanner staging is used throughout almost all of the physical examination literature that deals with making assessments of child sexual abuse, because what is important about it is not just the chronologic age, but correlating what findings occur depending upon the age of the child when the event occurs. In other words, Dr. Woodling testified, staging using the Tanner classification is always used in sexual abuse assessments and has never been disregarded, but it is used only to establish a "global picture of when you would predict events to occur in the life of the individual as memorialized in the photograph, and I feel that Tanner is only a small part of that full pie that is called the clinical opinion of age."

### POST-HEARING BRIEFS

The court permitted the parties to file post-hearing briefs, and in its post-hearing

brief, the government states that it conceded to the defense before the hearing that the use of the Tanner Scale to determine the age of the child in a visual depiction is not the purpose for which the scale was developed, nor is it applicable to all ethnic groups. Thus, the government states, while the Tanner Scale is a scientific test, it is not a scientific test which, by itself, can be used for the purpose of determining the age of a child in a visual depiction. The Tanner Scale is properly used to confirm that the clinical observations of a physician are consistent with medical knowledge. As Dr. Woodling explained, the government states, using the Tanner Scale stages of development illustrates the developmental indicators an experienced physician will look for in the physical development of any female child. This process turns the Tanner Scale back to its intended procedure of first determining the age of the child, then determining if the child's development is consistent with known developmental guidelines.

The government states that this method is consistent with accepted medical practice as well as with the scant case law on the subject of the Tanner Scale. Early on, the government states, the Ninth Circuit Court of Appeals avoided the question but speculated whether the "backwards" use of the Tanner Scale would pass scrutiny under *Daubert*. *United States v. Todd*, 964 F.2d 925, 931 (9th Cir.1992). More recently, in *United States v. Katz*, 178 F.3d 368 (5th Cir.1999), the Fifth Circuit determined that the Tanner Scale is, in fact, the recognized scientific test utilized for determining the age of post-pubescent Caucasian females in that it has been subject to peer review and publication, and that it is a scientifically valid methodology for determining the age of individuals. That case, in which Dr. Woodling testified as an expert, turned on the ability to determine the age of the children depicted in GIF or graphic image files, which were still pictures of poor quality found on a computer. Those images were excluded by the court upon testimony from Dr. Woodling that the female depicted was a Tanner stage

five, meaning the age range extended beyond age 18. The prosecution posited that use of the Tanner Scale, standing alone, was sufficient, and the court limited Dr. Woodling to only the Tanner Scale method. The appellate court ruled:

> A fair reading of the extensive record in this case reveals that Dr. Woodling's expertise was linked to Tanner Scale methodology, and that the district court did not abuse its gate keeping function in limiting his opinion testimony to that methodology. However, the government is not precluded from attempting to persuade the district court that some other witness can express a reliable opinion concerning the age of the models using scientifically valid methodology that is not dependent upon the Tanner Scale.

*United States v. Katz*, 178 F.3d at 373–74.

The government states that there are four important differences between *Katz* and the instant case: First, Dr. Woodling was able to determine, with reference to the Tanner Scale, that the age range of the child in the video "Fun with Daddy" was a Tanner stage three and therefore the child was less than 18 years. Second, the government argues, the quality of the video is adequate to observe physical development. Third, the movement depicted in the video gives greater opportunity than in a still picture to observe the contours and features of the body. Fourth, Dr. Woodling is not restricted to using only the Tanner Scale. His clinical observations, based on training and experience, are equally valid under *Daubert*, the government asserts.

The government further argues that *Daubert* permits the trial court to admit expert opinion which cannot be measured or quantified by scientific testing, and relies upon the decision of the United States Supreme Court in *Kumho Tire Co.*, 526 U.S. at 147, 119 S.Ct. 1167, and upon the decision of the Sixth Circuit Court of Appeals in *United States v. Brown*, 2000 WL 1290368 (6th Cir. Sept.6, 2000). In conclusion, the government argues that Dr. Woo-

dling's expert opinion is based on his years of clinical experience, his education, training, teaching and writing, as well as his prior experience assisting the United States Customs Service by reviewing seized child pornography videos. This expertise renders him qualified to state an opinion in this case which will be relevant and reliable [Doc. 34].

Defendant also filed a post-hearing brief, asserting that Dr. Woodling's testimony should not be admitted into evidence in this case. The defendant asserts that the prosecution is seeking to avoid the reliability requirements of *Daubert* by disavowing the underlying scientific foundations of medicine. The government is requesting the court to abandon or ignore all of the standards suggested by *Daubert* and *Kumho*, the defendant states, and this is simply no longer permissible after the Supreme Court's decision in *Kumho*. These decisions require a thoughtful and detailed analysis before expert opinion can be admitted, and the proponent of the testimony must provide the foundation for this testimony to be admissible.

Turning to the testimony of Dr. Woodling, the defendant points out that Dr. Woodling cited the following areas that he observed in making his assessment:

1. Breast development
2. Development of the labia majora and labia minora
3. Presence of pubic hair
4. Dark cutaneous pigmentation
5. Distinct and prominent perineal body
6. Absence of overt signs of recent trauma
7. Prominent lumbar lordosis
8. Protuberant abdomen below the umbilicus
9. Early pubertal baby fat distribution on the body and face

Defendant asserts that Dr. Woodling ultimately conceded that the presence or absence of recent trauma was irrelevant to his estimate of the female actor's age.

Defendant states that Dr. Woodling was taken through each of the remaining findings and asked if he could cite to any scientific or medical literature that supported his use of these observations to arrive at an estimated chronological age, and with the exception of the Tanner Scale, he was unable to do so. Specifically, defendant asserts that the government was unable to:

1. Offer any scientific or medical literature supporting Dr. Woodling's method or findings
2. Show that Dr. Woodling's theories or techniques had been tested
3. Show that Dr. Woodling's theories or techniques had been subject to peer review
4. Show that Dr. Woodling's techniques had any particular known error rate
5. Show any standards controlling the technique used by Dr. Woodling
6. Show that the theories and techniques employed by Dr. Woodling had gained general acceptance within the relevant scientific community.

Defendant further argues that although Dr. Woodling has placed particular emphasis on his clinical experience, his clinical work, as it relates to assessing chronological age, has never been collected and published in any way and Dr. Woodling conceded that his clinical observations have never been subjected to any type of independent testing nor are any statistics available to show a possible error rate for his observations.

The only scientific research that Dr. Woodling was able to cite to, defendant asserts, was the work started by Dr. James Tanner and defendant asserts that Dr. Woodling is seeking to apply the Tanner Scale in estimating the chronological age of the female actor who appeared in the video involved in this case. Defendant argues that such use of the Tanner Scale is inappropriate and points to the statements by Drs. Tanner and Rosenblum that the staging of sexual maturation (Tanner staging) being used not to stage maturation

but to estimate probable chronological age is a wholly illegitimate use of Tanner staging.

Defendant admits that the prosecution has conceded that use of the Tanner Scale to determine the age of an actor in a visual depiction is not the purpose for which the scale was developed, and that the Tanner Scale does not apply to all people. However, the defendant argues, *Daubert* and *Kumho* created a standard so that experts would not be able to come into federal courts and espouse views that were unreliable. Defendant asserts further that the government in this case is essentially arguing that no standard be applied because they do not have an expert whose methodology will withstand critical scrutiny. Therefore, defendant concludes, the expert testimony of Dr. Bruce Woodling should be excluded by the court in this case [Doc. 36].

The government filed a memorandum in response and rebuttal to the post-hearing brief filed by defendant, pointing out that it is not attempting to establish the validity of the Tanner Scale for use in determining ages of children in photographs. Rather, the government states, the Tanner Scale is only a tool used by a physician in his or her education and training, or in formation of his or her background knowledge which forms the basis for clinical observation of children. The government further points out that although the defendant quoted from the initial letter from Drs. Tanner and Rosenblum appearing in the journal *Pediatrics*, he did not quote from the subsequent letter from Dr. Rosenblum stating that the use of the Tanner Scale "as a convenient reference terminology for clinical judgment," is permissible.

The government further points out that there is no scientific test to determine the exact age of a child, although body measurement, blood tests and such would be helpful if the child were subject to a physical examination. Only clinical judgment, education and training would be of assistance in evaluating a child depicted in a visual image, the government asserts.

The government states that Dr. Woodling is offering his opinion as an expert who has been trained in anatomy and physical development of the human body and who has seen thousands of children and adults in a clinical setting and made observations about physical development. Dr. Woodling's education, training and experience qualify him as an expert physician, and he also has training and experience in evaluating the types of pornographic material currently before the court. The current community of physicians agree that clinical judgment is the accepted standard by which a physician can give an expert opinion as to the age of a child in a visual depiction of pornography, the government concludes, and Dr. Woodling's expert opinion as to the age of the child in the pornographic video which is the subject of this case should be presented at trial to assist the jurors in their determination [Doc. 37].

### REVIEW OF RELEVANT AUTHORITIES

 In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that trial judges were required to make an initial determination "of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. This two-step inquiry requires the trial judge to assess the relevance and the reliability of the expert's testimony. The relevance requirement directs that there be a "fit" between the testimony and the issue to be resolved by the trial. *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir.1993). The reliability requirement is designed to focus on the methodology and principles underlying the testimony. *United States v. Bonds*, 12 F.3d at 556. *Greenwell v. Boatwright*, 184 F.3d 492, 495–96 (6th Cir.1999).

 The purpose of a *Daubert* hearing is to determine "the scientific validity and thus the evidentiary relevance and reliabil-

ity of the principles that underlie a proposed submission." *Daubert,* 509 U.S. at 594–95, 113 S.Ct. 2786. The Supreme Court has instructed in *Daubert* that courts are not to be concerned with the reliability of the conclusions generated by valid methods, principles and reasoning. If the principles, methodology and reasoning are scientifically valid then it follows that the inferences, assertions, and conclusions derived therefrom are scientifically valid as well. *Greenwell,* 184 F.3d at 496.

■ The Sixth Circuit Court of Appeals noted in *United States v. Harris,* 192 F.3d 580 (6th Cir.1999), that although *Daubert* was restricted by its facts to scientific testimony, the Sixth Circuit has broadly applied *Daubert's* relevance and reliability analysis to all evidence offered under Rule 702, Federal Rules of Evidence. Moreover, the United States Supreme Court in *Kumho Tire Co., v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), broadened the *Daubert* analysis to specifically include "technical" as well as "other specialized knowledge." Judge Merritt, in his dissenting opinion in *Greenwell v. Boatwright, supra,* observed that the Sixth Circuit has long required judges to give a "hard look" and carefully assess the scientific conclusions and reasoning of experts because jurors are frequently overly impressed by conclusory opinions of scientific experts paid by a party. *See, Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1352 (6th Cir.1992). Today, Judge Merritt observed, trial judges have an unequivocal duty to give careful scrutiny to the testimony of paid experts in order to avoid verdicts based on "junk science." As the Supreme Court again stated this past term, Judge Merritt further observed, Federal Rule of Evidence 702 "imposes a special obligation upon a trial judge to 'insure that any and all scientific testimony . . . is not only relevant, but also reliable,' " *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 148, 119 S.Ct. 1167, 143 L.Ed.2d 238, *quoting Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. Under *Daubert,* trial judges must act as "gatekeepers" to undertake a "preliminary assessment of whether the reasoning or methodology underlying [expert] testimony is scientifically valid." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786. Thus, trial judges must be on guard against all forms of junk science that may creep into the courtroom. *Greenwell,* 184 F.3d at 501 (Merritt, J., dissenting).

In *Daubert,* the United States Supreme Court suggested four nonexclusive questions for judges to consider when admitting scientific evidence: (1) Is it testable and has it been tested? (2) Has it been subjected to peer review? (3) What is the potential rate of error? (4) Is the technique widely accepted in the relevant scientific community? A fifth factor has been added to the Supreme Court's list by a number of the circuits considering expert testimony, including the Sixth Circuit Court of Appeals: "Whether the experts are proposing to testify about matters growing naturally and directly out of research they have concluded independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying," because the former "provides important, objective proof that the research comports with the dictates of good science." *Smelser v. Norfolk Southern Railway,* 105 F.3d 299 (6th Cir.1997). In *Smelser,* the Sixth Circuit reversed the trial court because the trial court allowed plaintiff's expert to offer his opinion that a defective shoulder belt in the company pickup truck, and not a rear-end collision, caused the employee's back injuries and aggravated his neck injuries. The trial court failed to adequately assess the reliability of the methodology underlying the expert's opinions both as to defect and causation and also failed to recognize that the expert's opinion as to the cause of the plaintiff's specific injuries went beyond his expertise in biomechanics. Thus, the court ruled the trial court failed to adequately perform its gatekeeping functions as directed by the Supreme Court in *Daubert.*

■ The Sixth Circuit initially noted that under *Daubert,* the trial judge, when

performing the gatekeeping function, must use a two-step inquiry which examines the expert's opinion testimony for reliability and relevance. First, the court is to determine "whether the expert's testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to 'good science.'" An expert opinion that is based on scientifically valid principles will satisfy Rule 702, Federal Rules of Evidence; an expert's subjective belief or unsupported speculation will not.

Secondly, the Sixth Circuit ruled, the court "must insure that the proposed expert testimony is relevant to the task at hand". When considering reliability, the trial court must focus on the soundness of the expert's methodology and not the correctness of his conclusions. The trial court in *Smelser* failed to consider any of these factors, the Sixth Circuit ruled, and reversed the judgment for the plaintiff.

In *United States v. Jones,* 107 F.3d 1147 (6th Cir.1997), the Sixth Circuit was presented with the issue of whether a handwriting expert's testimony was admissible to show that signatures on various documents were defendant's. The Sixth Circuit initially noted that it had previously ruled that although *Daubert* dealt with scientific experts, its language relative to the "gatekeeper" function of federal judges was applicable to all expert testimony offered under Rule 702, Federal Rules of Evidence. *United States v. Thomas,* 74 F.3d 676, 681 (6th Cir.) *cert. denied,* 517 U.S. 1162, 116 S.Ct. 1558, 134 L.Ed.2d 659 (1996). In that case, the defendant requested the court to apply a strict *Daubert* analysis to determine if expert handwriting testimony should be admitted at trial. The Sixth Circuit rejected this suggestion, however, noting that *Daubert* did not create a new framework for analyzing proffered expert testimony based upon "technical, or other specialized knowledge." Rather, the court ruled, *Daubert* provides a "flexible" framework to aid district courts in determining whether expert scientific testimony is reliable. If that frame-

work were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony—that derived substantially from practical experience—would be excluded. Such a result truly would turn *Daubert* on its head, the court noted, and went on to hold, without relying on *Daubert* analysis, that expert handwriting analysis offered in that case was sufficiently reliable to be admitted into evidence. *United States v. Jones,* 107 F.3d 1147, 1158 (6th Cir.1997).

In *United States v. Long,* 1997 WL 130079 (6th Cir. Mar. 19, 1997), the Sixth Circuit upheld the conclusion of a magistrate judge that expert testimony on the ages of video participants in a case involving child pornography in violation of 18 U.S.C. § 2252(a)(2) did not invade the province of the jury. *See United States v. Nolan,* 818 F.2d 1015, 1018 (1st Cir.1987); *United States v. Villard,* 700 F.Supp. 803, 814 (D.N.J.1988). The Sixth Circuit found the government's expert witness, a medical doctor and forensic psychiatrist, sufficiently qualified to give testimony regarding the ages of persons portrayed in the material in question. In addition, the Sixth Circuit affirmed the opinion of the United States District Court for the Western District of Michigan in *United States v. Snow,* 1990 WL 171572 (6th Cir. Nov.7, 1990), wherein the government had utilized a forensic pathologist to examine the seized publications and to opine that, in his medical opinion, all the models in the publications were under eighteen years of age, and in fact, probably not even eleven or twelve years of age.

### DISCUSSION OF THE CASE SUB JUDICE

Rule 702, Federal Rules of Evidence, provides as follows:

Rule 702. Testimony by Experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

training, or education, may testify thereto in the form of an opinion or otherwise.

The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), established guideposts for district courts to use in determining the admissibility of expert testimony. The Court outlined the trial judge's "gatekeeping" role regarding the admission of expert proof on scientific issues. *Id.* at 597–98, 113 S.Ct. 2786. The Court recognized that in the usual case the evaluation of expert testimony must be left to the jury, but emphasized trial court responsibility pursuant to Rule 104(a), Federal Rules of Evidence, to screen scientific evidence in order to keep unreliable evidence out of the courtroom. *Id.* at 593, 113 S.Ct. 2786. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court extended the "gatekeeping" role established by the Court in *Daubert* to include all expert testimony, both scientific and technical or other specialized knowledge.

Rule 702 has three important requirements. First, the witness proffered to testify to specialized knowledge must be an expert by "knowledge, skill, experience, training, or education." This requirement has always been treated liberally. *See In re: Paoli RR Yard PCB Litigation*, 916 F.2d 829, 855 (3rd Cir.1990). However, liberal interpretation of this phrase does not mean that a witness is an expert simply because he claims to be.

■ The second requirement of Rule 702 is that the expert must testify to "scientific, technical or other specialized knowledge." The requirement that an expert's testimony pertain to "scientific, technical, or other specialized knowledge" establishes a standard of "evidentiary reliability." For purposes of Rule 702, "evidentiary reliability" means, essentially, "trustworthiness." By defining evidentiary reliability in terms of scientific or technical validity, the *Daubert* Court instructed lower courts that they are not to be concerned with the reliability of the conclusions generated by valid methods, principles, and reasoning. *United States v. Bonds*, 12 F.3d 540, 556 (6th Cir.1993). Instead, "they are only to determine whether the principles and methodology underlying the testimony itself are valid."

■ *Daubert* suggests several factors that a court should consider in evaluating whether a specific scientific or technical methodology is reliable (i.e., scientifically valid), including the testability of the expert's hypothesis (whether it can be and has been tested), whether the methodology has been subjected to peer review and publication, the frequency by which the methodology leads to erroneous results, and whether the methodology has been generally accepted in the scientific community. *See Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786.

■ Last of all, in addition to reliability, Rule 702 requires that the expert's testimony must assist the trier of fact. This requires that the scientific evidence must "fit" the facts of the case. There must be a connection between the scientific or technical research or test result to be presented in particular disputed factual issues in the case. It must be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

■ Thus, faced with a proffer of expert testimony and a challenge to its admissibility, the trial judge must determine whether (1) a qualified expert is proposing to testify to (2) scientific, technical, or other specialized knowledge that (3) will assist the trier of fact to understand and determine a fact in issue. The court in *Daubert* held that the admissibility of expert testimony "should be established by a preponderance of the proof." *Daubert*, 509 U.S. at 592 n. 10, 113 S.Ct. 2786. Although *Daubert* did not state who has the burden to prove admissibility, under

ordinary evidentiary principles, the proponent of the evidence has the burden of establishing that the evidence is admissible. *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299, 303 (6th Cir.) *cert. denied*, 522 U.S. 817, 118 S.Ct. 67, 139 L.Ed.2d 29 (1997); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995) (*Daubert II* ); *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir.1996).

The factors enunciated by the United States Supreme Court in *Daubert* regulating the admissibility of scientific testimony, and extended to technical testimony by the recent decision of the United States Supreme Court in *Kumho Tire Co.*, must be examined by the court in determining whether Dr. Woodling's testimony is both relevant and reliable and admissible into evidence under Rule 702, Federal Rules of Evidence. In making this determination, the court cannot be concerned with the conclusions reached by Dr. Woodling, but must be concerned with the scientific and/or technical validity and thus the evidentiary relevance and reliability of the principles that underlie Dr. Woodling's proposed conclusions.

### A. A Qualified Expert

 It is clear from the evidence presented during the *Daubert* hearing that Dr. Woodling is qualified to express an expert opinion concerning the age of the female depicted in the video tape entitled "Sucking Daddy," subsequently referred to as "Fun with Daddy." Dr. Woodling graduated from the University of Southern California School of Medicine in 1972, and completed a family practice residency in 1975. He is board-certified by the American Academy of Family Physicians and has spent over twenty years in a private family practice in Ventura, California. Dr. Woodling testified that he had treated thousands of young females of all ages during that period of time. He is the CEO, Founder, and Medical Director of New Horizons Outreach, Inc., located in Camarillo, California, and served as Executive Director of the Barbara Sinatra Children's Center in Rancho Mirage, California, from 1996 to 1999. He is currently the Secretary–General and Executive Director of the American Academy of Aesthetic Medicine at Camarillo, California. Dr. Woodling has published extensively in scientific journals and has specifically written about the medical-legal evaluation of suspected victims of sexual assault, child and adolescent victims of sexual assault, rape and molestation, child abuse and neglect, sexual abuse in the child, the medical protocol for examination of sexual assault and child sexual abuse victims, medical examination of the sexually abused child, and child sexual abuse. It is clear from the evidence presented at the *Daubert* hearing that Dr. Woodling is qualified by his knowledge, skill, experience, training, and education to offer an expert opinion in this case, and the defendant did not seriously question Dr. Woodling's qualifications as an expert to express an opinion concerning the age of the female depicted in the video tape at issue in this case.

### B. Scientific, Technical or Specialized Knowledge

The second factor which this court must examine to determine if Dr. Woodling's testimony should be presented to the jury in this case is whether his testimony, relating to scientific, technical, and his specialized knowledge, is reliable. In this particular case, the guideposts provided to trial courts to help them evaluate scientific, and/or technical evidence are of limited value. In regard to the first guidepost, "Is it testable and has it been tested?", it must be acknowledged that testimony relating to the age of a minor child cannot be quantified with scientific accuracy. At the same time, however, Dr. Woodling's testimony is based, in part, on the "Tanner Scale," which has been used since its development in 1947.

In his "Affidavit and Attestation" filed in this case, Dr. Woodling relates that he personally reviewed the video entitled "Sucking Daddy" on August 3, 2000, that it

was provided to him by the Assistant United States Attorney, and that it is the video cassette reviewed by him as an expert witness in the matter of United States v. Pollard, 3:00–CR–67. Dr. Woodling relates that the video is reported to be a direct copy made by the Department of Treasury, U.S. Customs Service, video tape NV97QR98NV0002 entitled "Fun with Daddy." Dr. Woodling states that this video clearly depicts a female child twelve years of age or younger, and she may be as young as eight years or as old as 12.5 years. His assessment is based on multiple personal viewings by him of the video and the correlation of his observations to a lengthy clinical experience in assessing chronologic age based on physical and sexual development as well as spontaneous behaviors.

Dr. Woodling further states that the pubertal breast development is early and clearly represents early developmental mounding with early developmental areolar enlargement. The nipple does not create a secondary mound above the level of the breast mound. The labia majora and labia minora show early pubertal transformation with sparse pubic hair noted along the labia majora extended toward the pubis. Dark cutaneous pigmentation is noted along the margins of the labia minora with a distinct and prominent perineal body. No overt signs of recent trauma were noted. Dr. Woodling further states that the female child observed in the video, once fully undressed, manifests a prominent lumbar lordosis with a protuberant abdomen below the umbilicus. Her body and face clearly display an early pubertal baby fat distribution.

In conclusion, Dr. Woodling states that the female is approximately ten years old, but she may be as young as eight years or as old as 12.5 years. Dr. Woodling states that his opinion is rendered with medical certainty based solely on his personal viewing of the video cassette and is correlated to his personal and clinical experience as a practicing family physician and qualified forensic examining physician [Gov't Ex. 5].

In Dr. Woodling's attachment to his affidavit and attestation, "The Scientific Basis of the Tanner Scale for Pubertal Development Affidavit," Dr. Woodling relates that the attached affidavit and attestation were written based on his careful observation of the development and manifestations of breast anatomy and pubic hair occurrence and physical distribution. These observations are correlated to what is known as the *Tanner Scale of Progressive Pubertal Development,* Dr. Woodling states, a visual depiction that correlates with a range of ages. Ninety–eight point five percent (98.5%) of girls will manifest Tanner Stage 5 by sixteen years, six months. Virtually all girls with rare exception (99.9%) will be less than eighteen years of age if the Tanner classification of pubic hair is Tanner Stage 1–4.

Dr. Woodling further summarizes the criteria that constitute Marshall and Tanner stages of breast development published in 1969:

Stage Breast 1: Preadolescent; elevation of the nipple only.

Stage Breast 2: Breast bud stage; elevation of the breast and nipple as a small mound, enlargement of the areolar diameter.

Stage Breast 3: Further enlargement of the breast areola with no separation of the contours.

Stage Breast 4: Further enlargement with projection of the areola and nipple to form a secondary mound above the level of the breast.

Stage Breast 5: Mature stage; projection of the nipple only, resulting from recession of the areola to the general contour of the breast.

The following summarized the criteria that constitute Marshall and Tanner's stages of female pubic hair development published in 1969:

Stage Pubic Hair 1: None.

Stage Pubic Hair 2: Sparse growth of long, slightly pigmented, straight

only or slightly curled hair along the labia.

Stage Pubic Hair 3: Thicker, coarser and more curled hair extending sparsely over the junction of the pubis.

Stage Pubic Hair 4: Hair is adult in type and spreads over the mons pubis but not the medial surfaces of the thighs.

Stage Public Hair 5: Hair is spread to the medial surfaces of the thighs.

[Gov't Ex. 3].

Defendant pointed out in his cross-examination of Dr. Woodling at the evidentiary hearing that there is a controversy surrounding the Tanner Scale. In fact, Dr. Arlan L. Rosenbloom and Dr. James M. Tanner (the developer of the "Tanner Scale") wrote a letter which appeared in the Journal *Pediatrics* in which Drs. Rosenbloom and Tanner related that one of them had been involved as an expert in several U.S. federal cases of possession of alleged child pornography, in which seized materials (videos, photographs, computer downloads) were used as evidence against individuals identified in "sting" operations, wherein government agents took over pornographic businesses. In those cases, the letter relates, the staging of sexual maturation (Tanner stage) has been used not to stage maturation, but to estimate probable chronologic age. "This is a wholly illegitimate use of Tanner staging: No equations exist estimating age from stage, and even if they did, the degree of unreliability in the staging—the independent variable—would introduce large errors into the estimation of age, the dependent variable. Furthermore, the unreliability of the stage rating is increased to an unknown degree by improperly performing staging, that is, not a clinical examination but through not standardized and, thus, unsuitable photographs." Therefore, the doctors stated, they wished to caution pediatricians and other physicians to refrain from providing "expert" testimony as to chronologic age based on Tanner staging, which was designed for estimating development of phy-

siologic age for medical, educational, and sport purposes—in other words, identifying early and late matures. While the method is appropriate for this, the doctors related, provided chronologic age is known, it is not designed for estimating chronologic age and, therefore, not properly used for that purpose [Def.Ex. 1].

The letter from Drs. Rosenbloom and Tanner precipitated a scholarly discussion between physicians in the journal *Pediatrics*, resulting in a separate letter from Dr. Rosenbloom explaining that neither he nor Dr. Tanner intended to imply that physicians should refrain from providing expert testimony in suspected child pornography cases, only that they should refrain from providing testimony as to chronologic age based on Tanner staging. In fact, Dr. Rosenbloom wrote, there is a real question as to whether the Tanner scale should be used at all in determining chronologic age because the expert pediatrician comes to the evidence with an ability to estimate age based on facial appearance, body shape, muscular development, and sexual maturation [Def.Ex. 2].

From the testimony of Dr. Woodling, it was clear that Dr. Woodling utilized the Tanner scale in formulating his expert opinion in this case. The government had informed defendant that it would not use the "Tanner scale as a scientific test to determine the age of the child in the video" [Def.Ex. 3]. The government also provided to the defendant a reported decision in which Dr. Woodling testified as an expert but in which the trial court excluded portions of his testimony because Dr. Woodling could not render a reliable opinion as to the age of the individuals depicted in photographs. Although the factual situation in that case, *United States v. Katz*, 178 F.3d 368 (5th Cir.1999), is convoluted, it appears that the trial judge excluded portions of Dr. Woodling's testimony because he was unable to utilize the Tanner scale to render a reliable opinion as to the age of the individuals depicted in the pho-

tographs based on the Tanner scale of pubic hair development.

Based on this criticism of the Tanner scale, defendant argues that Dr. Woodling's expert testimony is unreliable. Defendant further argues that the government has failed to demonstrate the potential rate of error utilizing the Tanner scale and that the Tanner scale is not widely accepted in the relevant scientific community, given the controversy surrounding utilizing the Tanner scale to determine chronologic age. The government has responded that the Tanner scale has been tested, it has been subjected to peer review, the potential rate of error has been calculated by experts utilizing the scale, and the technique is widely accepted in the relevant scientific community as a tool to use in assessing chronologic age. The government states, as it did in its letter of September 11, 2000 [Def.Ex. 3] that it is not relying upon the Tanner scale as a scientific test to determine the age of the child in the video, but that Dr. Woodling utilized the Tanner scale, along with additional factors, to render an expert opinion in this case. The government further points out that the Tanner scale was not developed for use in this litigation, but was research conducted by a medical doctor over fifty years ago for estimating development or physiologic age for medical, educational, and sports purposes.

As pointed out by the Sixth Circuit Court of Appeals in *United States v. Jones*, 107 F.3d 1147 (6th Cir.1997), the guideposts set forth by the United States Supreme Court in *Daubert* may not be helpful when evaluating non-scientific evidence. This case involves testimony from an expert which incorporates scientific evidence, but which is grounded upon a non-scientific foundation. As pointed out by the Sixth Circuit, if the tests enunciated in *Daubert* and the factors listed by the court were to be applied to non-scientific opinion in a rigid fashion, many types of relevant and reliable expert testimony—that derived substantially from practical experience—would be excluded. In order to further the purpose of *Daubert*, the Sixth Circuit concluded, it is sometimes necessary to evaluate non-scientific opinion evidence without relying upon *Daubert*. In that case, dealing with handwriting analysis, the court went on to find the expert opinion testimony to be both relevant and reliable and admissible at trial. *Id.*

It appears that a similar approach must be utilized in this case, inasmuch as the expert opinion provided by Dr. Woodling, while incorporating scientific elements, also relies upon non-scientific evidence as well.

It is in this regard that the government parts company with the defendant, pointing out that Dr. Woodling's testimony does not attempt to utilize the Tanner scale as a scientific test to determine the chronologic age of the child in the video. Rather, Dr. Woodling testified, both in his affidavit and during the evidentiary hearing, that he based his expert opinion upon multiple personal viewings of the video and the correlation of his observations to a lengthy clinical experience in assessing chronologic age based on physical and sexual development as well as spontaneous behaviors.

It is manifest from Dr. Woodling's testimony that he did utilize the Tanner scale in helping to formulate his expert opinion, but that was only one of a number of factors he took into account when reaching his expert opinion. Dr. Woodling testified that he had treated thousands of young girls and young women, he is a qualified forensic examining physician, and he has worked and written extensively in the area of sexual abuse of children. The United States Supreme Court ruled in *Daubert* that in order for expert testimony to be admissible at trial, it must be both relevant and reliable. The "reliability" of the proposed expert testimony was addressed by the Supreme Court by requiring that the expert be properly qualified and possess valid scientific and/or technical knowledge. It is the opinion of the undersigned that the qualifications and the reliability of Dr. Woodling's testimony has been properly

established, and his testimony is properly reliable to be introduced into evidence pursuant to Rule 702, Federal Rules of Evidence.

### C. The Evidence Must Assist the Trier of Fact to Understand and Determine a Fact in Issue

While the court has previously found that Dr. Woodling is suitably qualified to testify in this case, and further found that his testimony is sufficiently reliable to be admissible at trial, the court must also determine if Dr. Woodling's testimony would assist the trier of fact to understand and determine a fact in issue. This is the "relevant" prong of the Supreme Court's two-prong test that expert testimony be properly relevant and reliable in order to be admissible.

In order to determine if proposed expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, the court must first determine whether expert testimony will assist the jury in resolving a question of fact or whether such expert testimony will simply make the job of the jury more difficult. As pointed out by the Fifth Circuit of Appeals in *United States v. Katz*, 178 F.3d 368 (5th Cir.1999): "The threshold question—whether the age of a model in a child pornography prosecution can be determined by a lay jury without the assistance of expert testimony—must be determined on a case by case basis."

Of course, if the government can produce direct evidence of the age of the model, expert testimony would be unnecessary and, consequently, irrelevant to the jury's determination. If the model is unavailable or if the government cannot produce direct testimony of the model's age, however, expert testimony may be of assistance to the jury. At the same time, it is sometimes possible for the factfinder to decide the issue of a child in a child pornography case without hearing any expert testimony. For example, in *United States v. O'Malley*, 854 F.2d 1085 (8th Cir.1988), letters from the defendant describing the models in the pictures as a "twelve year old girl" and "younger than [nine]," combined with the pictures themselves, was sufficient to sustain a child pornography conviction.

In other cases, on the other hand, the parties have been allowed to present conflicting expert testimony. In *United States v. Anderton*, 136 F.3d 747 (11th Cir.1998), the government presented a medical doctor with expertise in adolescent growth and development who testified that the models were between eleven and fifteen and a half years of age. Defendant's expert, a clinical psychologist and sex therapist, testified that the ages of the models could not be determined. In addition, as pointed out by the Fifth Court, in some cases one party presents expert testimony while the other does not. In *United States v. Broyles*, 37 F.3d 1314, 1316 (8th Cir. 1994), the government presented the expert testimony of a pediatric endocrinologist and defendant presented no evidence. A case by case analysis will encounter some images in which the models are prepubescent children who are so obviously less than eighteen years old that expert testimony is not necessary or helpful to the factfinder, the Fifth Circuit point out. On the other hand, some cases will be based on images of models of sufficient maturity that there is no need for expert testimony. In that case, the Fifth Circuit ruled that to determine the age of the model, who was post-puberty but appeared quite young, expert testimony would be necessary to assist the trier of fact to understand the evidence or to determine a fact in issue. *United States v. Katz*, 178 F.3d at 372.

The Sixth Circuit has accepted expert testimony in a number of child pornography cases. For example, in *United States v. Long*, 108 F.3d 1377, 1997 WL 130079 (6th Cir.1997), the government consulted with a pediatrician with experience in using the Tanner scale, which the court relates as a methodology used to help doctors measure the stages of puberty in a child. After reviewing the alleged child

pornography, however, the pediatrician related that he could not determine whether any of the individuals shown in the materials were under eighteen years of age. All were physically, sexually mature, the pediatrician reported, and there were no distinguishing physical characteristics that identified them as being under eighteen years of age. The government then sought a second opinion from a forensic psychiatrist who found several of the individuals depicted in the video tapes and magazines to be minors, utilizing the Tanner scale in his detailed testimony. The Sixth Circuit Court of appeals upheld the decision of the trial court in admitting the testimony of the forensic psychiatrist, ruling that expert testimony on the ages of the video participants did not invade the province of the jury. The Sixth Circuit relied upon the decisions of the First Circuit Court of Appeals in *United States v. Nolan*, 818 F.2d 1015, 1018 (1st Cir.1987), and the decision of the United States District Court for the District of New Jersey in *United States v. Villard*, 700 F.Supp. 803, 814 (D.N.J.1988). While the Sixth Circuit ruled that it was not error to admit the testimony of the expert, it also noted that the jury itself could make its own determination of age based on the evidence and on the juror's own experience in a case of that type. *United States v. Long*, 108 F.3d at 1379, 1997 WL 130079.

In similar vein, in *United States v. Snow*, 917 F.2d 1305, 1990 WL 171572 (6th Cir.1990), the Sixth Circuit affirmed the defendant's conviction in a case in which the government utilized a forensic pathologist to examine the child pornography in question and to render his medical opinion on the ages of the models involved in the materials. In that case, the government's expert could identify the models in one video tape as being under the age of eighteen years, although the expert could not state with certainty that the models in a second video tape were underage.

In this case, it appears to the undersigned that the testimony of Dr. Woodling will be of substantial assistance to the jury in determining the age of the young lady featured in the video tape. The government suggests that the expert testimony would assist the trier of fact because of the condition of the film. While it is true that the film appears to be of older vintage, it appears to the undersigned that the expert testimony of Dr. Woodling will also be valuable in this case to help the jurors to determine if the model is a minor under the age of eighteen or an adult over the age of eighteen made up to appear as a minor. While the affirmative defense that the individual depicted was an adult at the time the image was created is not available to someone accused of unlawful possession of child pornography, as opposed to any of the other offenses such as distribution of the same, what an individual actually believed to be the age of the depicted person still goes to his state of mind in possessing the material. *United States v. Hilton*, 167 F.3d 61, 75 (1st Cir.1999).

### CONCLUSION

The United States Supreme Court has ruled that expert opinion testimony may be admitted into evidence under Rule 702, Federal Rules of Evidence, if the scientific, technical, or other specialized knowledge will assist the jury to understand the evidence or to determine a fact in issue and if the witness is qualified as an expert by knowledge, skill, experience, training, or education to render an expert opinion. The Supreme Court has further ruled that expert testimony must be both relevant and reliable in order to be admissible into evidence. The evidence presented during the course of the *Daubert* hearing, together with the documents introduced and the materials presented by the parties, established by a preponderance of the proof, in the mind of the undersigned, that Dr. Woodling's testimony is admissible at trial. Dr. Woodling is imminently qualified as an expert in the area of pubertal development of children, he possesses scientific and technical knowledge that will assist the trier of fact to understand and determine

the issues in this case. His testimony appears to be both relevant and reliable pursuant to Rule 702, Federal Rules of Evidence, and should be admissible at trial. It is the recommendation of the undersigned, therefore, that Dr. Woodling be found by this court as a qualified expert whose expert opinion is fully admissible at trial.